[No. S058378. Dec. 31, 1998.]

THOMAS B. FLETCHER, a Judge of the Superior Court, Petitioner, v. COMMISSION ON JUDICIAL PERFORMANCE, Respondent.

874

## COUNSEL

Dennis A. Fischer and John L. Ryan for Petitioner.

Jack Coyle for Respondent.

## OPINION

**THE COURT.**—Judge Thomas B. Fletcher of the Madera Superior Court has petitioned for review of the recommendation of the Commission on Judicial Performance (Commission) that we remove him from office for willful misconduct and "conduct prejudicial to the administration of justice that brings the judicial office into disrepute" (prejudicial misconduct). (Cal. Const., art. VI, § 18, former subd. (c) (former subdivision (c)), see now art. VI, § 18, subd. (d).)[1] Judge Fletcher (petitioner) concedes that he committed some of the misconduct underlying the recommendation and that "his actions call for severe censure." However, he contests many of the Commission's misconduct findings and argues that removal "is inappropriately harsh under the facts" of this case. Having independently reviewed the record, we find clear and convincing evidence to sustain all but one of the Commission's misconduct findings. Moreover, although some of the incidents of

[1] In 1994, by approving Proposition 190, the voters significantly changed the procedure for disciplining judges under article VI, section 18 of the California Constitution. Because the conduct at issue here occurred before the constitutional amendments took effect on March 1, 1995, we apply the former version of article VI, section 18. (*Dodds* v. *Commission on Judicial Performance* (1995) 12 Cal.4th 163, 168, fn. 1 [48 Cal.Rptr.2d 106, 906 P.2d 1260] (*Dodds*).)

misconduct may seem relatively minor, many unquestionably are not, and the record as a whole establishes a persistent pattern of misconduct that reflects a lack of judicial temperament. Accordingly, we adopt the Commission's removal recommendation.

## I. Procedural Background

In 1988, petitioner was elected, and then appointed, as Judge of the Sierra Justice Court in Madera County. He was later reelected to that office for a term beginning in January 1995. However, at that time, he became a municipal court judge of the Sierra Judicial District by operation of Proposition 191. By virtue of court consolidation on July 1, 1998, while this matter was pending, petitioner became a judge of the Madera Superior Court.

In February 1995, the Commission voted to initiate formal proceedings against petitioner. It later prepared a notice of formal proceedings alleging numerous counts of either willful or prejudicial misconduct, and two amended notices of formal proceedings. On February 20, 1996, before three special masters this court appointed, an eight-day hearing began on the charges in the Commission's second amended notice of formal proceedings, which alleged nineteen counts (many with subcounts) of either willful or prejudicial misconduct. The special masters filed their final report with the Commission on June 4, 1996, finding that petitioner had committed either willful or prejudicial misconduct in a number of the instances alleged.

After hearing oral argument as scheduled on August 22, 1996, the Commission ordered the case submitted. Petitioner, who failed to appear on August 22, moved to vacate submission, explaining that he had received a letter containing the notice of the August 22 argument but never opened it. The Commission granted the motion and held argument on October 23, 1996. It issued its decision and recommendation on January 10, 1997. Seven members of the Commission voted to recommend petitioner's removal from office; the remaining three members voted for severe public censure. Petitioner filed his petition with this court in July 1997.[2]

## II. Applicable Legal Standards

As relevant in this case, former subdivision (c) authorized removal of a judge from office for "willful misconduct in office." Willful misconduct is "unjudicial conduct committed in bad faith by a judge acting in his

---

[2]Resolution of this case has been delayed significantly by repeated filing extensions that petitioner requested so that he could address the numerous misconduct counts underlying the Commission's removal recommendation.

judicial capacity." (*Spruance* v. *Commission on Judicial Qualifications* (1975) 13 Cal.3d 778, 795 [119 Cal.Rptr. 841, 532 P.2d 1209] (*Spruance*).) As we recently explained in *Broadman* v. *Commission on Judicial Performance* (1998) 18 Cal.4th 1079, 1092 [77 Cal.Rptr.2d 408, 959 P.2d 715] (*Broadman*), to support a finding of bad faith, the evidence must establish that the judge performed a judicial act (1) "for a corrupt purpose (which is any purpose other than the faithful discharge of judicial duties)," or (2) "with knowledge that the act is beyond the judge's lawful judicial power," or (3) "that exceeds the judge's lawful power with a conscious disregard for the limits of the judge's authority."

Former subdivision (c) also authorized removal of a judge from office for prejudicial misconduct, i.e., "conduct prejudicial to the administration of justice that brings the judicial office into disrepute." Prejudicial misconduct includes acts that a judge "undertakes in good faith but which nevertheless would appear to an objective observer to be not only unjudicial conduct but conduct prejudicial to public esteem for the judicial office." (*Geiler* v. *Commission on Judicial Qualifications* (1973) 10 Cal.3d 270, 284 [110 Cal.Rptr. 201, 515 P.2d 1], fn. omitted.) It also includes "wilful misconduct out of office, i.e., unjudicial conduct committed in bad faith by a judge not then acting in a judicial capacity." (*Id.* at p. 284, fn. 11.) "In this context, bad faith means a culpable mental state beyond mere negligence and consisting of either knowing or not caring that the conduct being undertaken is unjudicial and prejudicial to public esteem. In sum, to constitute prejudicial conduct, a judge's actions must bring 'the judicial office into disrepute,' that is, the conduct would appear to an objective observer to be prejudicial to ' "public esteem for the judicial office." ' [Citation.]" (*Broadman, supra,* 18 Cal.4th at p. 1093.)

■ In reviewing the Commission's removal recommendation under former subdivision (c), we may consider only those misconduct charges that the Commission has sustained. (*Broadman, supra,* 18 Cal.4th at p. 1089.) We independently review the evidentiary record and will sustain the charges of misconduct only if clear and convincing evidence proves them to a reasonable certainty. (*Kennick* v. *Commission on Judicial Performance* (1990) 50 Cal.3d 297, 314 [267 Cal.Rptr. 293, 787 P.2d 591, 87 A.L.R.4th 679] (*Kennick*).) We give " 'special weight' " to the special masters' factual determinations, because they "had the advantage of observing the demeanor of the various witnesses. [Citations.] In addition, in recognition of the Commission's expertise, we accord 'great weight' to the Commission's conclusions of law. [Citations.]" (*Dodds, supra,* 12 Cal.4th at p. 168.) Based on our factual findings and legal conclusions, we then determine independently what, if any, discipline is appropriate. (*Id.* at pp. 168-169.)

### III. Specific Charges

As we have noted, petitioner concedes he committed prejudicial misconduct in some instances. However, he challenges many of the Commission's findings of prejudicial misconduct and all of its findings of willful misconduct. Because they are relevant to the proper level of discipline, we first briefly summarize the uncontested charges. We then consider the contested charges.

#### A. Conceded Prejudicial Misconduct

##### 1. Count Four: Improper Entry of Judgment Against Nonparty

On November 30, 1992, in a small claims matter involving construction work done on property, judgment was entered for Thorn Hertwig against Tyrone Henderson as agent for Rickey Henderson. In January 1993, Hertwig amended his claim to add Rickey Henderson as a defendant. On May 24, 1993, the parties appeared for trial, and petitioner conducted a settlement conference. Also present was Ben Savage, the realtor who had sold the property to Rickey Henderson, who came to court as a witness for Hertwig. The parties agreed to a settlement, and a judgment was entered on May 24, 1993, directing Rickey Henderson to pay Hertwig $1,357.93. According to petitioner, the judgment did not mention Savage because Savage, although agreeing to pay damages, did not want a judgment entered against him. Savage disputed petitioner's recollection, testifying that he did not agree or respond when petitioner stated at the settlement conference that Savage should pay half of the damages. Savage later failed to pay Hertwig. In February 1994, although Savage had never been named or served in the action, petitioner directed entry of a "corrected" judgment that identified him as a defendant and directed him to pay damages. Savage appealed to the superior court, which reversed the judgment.

On these facts, the Commission unanimously concluded that petitioner committed prejudicial misconduct because he "made no effort to comply with or follow the law when he entered judgment" without providing Savage, who was never named as a party, notice and an opportunity to be heard. The Commission reasoned that petitioner "acted solely upon his belief that Savage ought to pay, and his pique that [Savage] did not." Petitioner does not contest the Commission's findings and conclusion. (See *Gonzalez* v. *Commission on Judicial Performance* (1983) 33 Cal.3d 359, 374 [188 Cal.Rptr. 880, 657 P.2d 372] (*Gonzalez*) [basing discipline on "disregard for even the minimal requirements of fairness and due process"].)

##### 2. Count Ten: Improper Comments About Counsel

Attorney Nancy Staggs, who was representing a criminal defendant before petitioner, did not appear at a scheduled hearing. After an unrecorded

telephone conference with Staggs's office, petitioner stated in open court: "She shouldn't be handling criminal cases. [¶] Here's another example of a civil attorney who shouldn't be handling criminal cases." Petitioner then commented that Staggs "probably had something more important to do today, like go to a PTA meeting." He continued: "She has a whole bunch of kids. She's been having kids ever since I've known her." Before the special masters, petitioner denied making these comments, suggested that the court reporter "made [them] up" to assist petitioner's political opponents, and stated that he had instead made complimentary remarks about Staggs. However, he also admitted sending Staggs a letter of apology. In his petition to this court, petitioner "accepts the [Commission's unanimous] finding that his statements concerning Ms. Staggs were inappropriate and could be deemed" prejudicial misconduct. (See *Kennick, supra,* 50 Cal.3d at p. 325 [basing finding of prejudicial misconduct on "unprofessional, demeaning and sexist" remarks].)

3. *Count Fourteen: Improper Use of Court Staff for Campaign Purposes*

During the first half of 1994, petitioner was running for reelection; the primary was scheduled for June 7, 1994. At the end of a court session in late April 1994, petitioner had a group photograph taken of court staff and others who appeared before him. Petitioner's clerk and the public defender initially declined petitioner's request that they pose for the picture. The public defender was busy with clients when petitioner came to her office and made the request. However, after petitioner "insisted" that they participate, both reluctantly agreed. Petitioner's clerk felt that petitioner had "ordered" her to participate and that she had no choice.

Based on petitioner's representations, almost all of those photographed believed the picture was simply a personal memento; none understood that petitioner would use it in his reelection campaign.[3] Indeed, both the public defender and the clerk had informed petitioner they did not want to be involved in the campaign. Despite this knowledge and contrary to his representations, in May 1994, petitioner asked a local newspaper to print the photograph. The newspaper responded that, because of the imminent election, it would not do so without charge, and that it would publish the photograph only as a paid advertisement. Petitioner agreed to pay to have

---

[3]In light of the testimony of those photographed, the special masters expressly found that petitioner's testimony about the incident was not credible.

the picture published. On May 26, one week before the election, the picture appeared in the paper with the caption, "PAID POLITICAL ADVERTISEMENT."[4]

On this record, the special masters concluded that "part of [petitioner's] motivation in placing the advertisement was to assist his re-election campaign," and that by failing to get consent from those photographed, his "conduct surrounding the taking and use of the photograph . . . constitute[d]" prejudicial misconduct. The Commission unanimously agreed.

In this court, petitioner "concedes the sufficiency of the evidence to sustain" the conclusion that he committed prejudicial misconduct in *using* the photograph for political purposes without getting consent from all participants. However, he contests the conclusion that his conduct surrounding the *taking* of the photograph constituted prejudicial misconduct.

■ In light of the circumstances here, we reject petitioner's contention. Petitioner himself testified that at least part of his purpose in having the picture taken was to assist his campaign. By insisting (over objections) that everyone participate, securing cooperation by stating that the picture was simply a personal memento, and failing to disclose his intent to use the picture in his campaign, petitioner committed prejudicial misconduct both in taking and using the picture for campaign purposes. (See *Gonzalez, supra*, 33 Cal.3d 359 at p. 374 ["exploitation of judicial office for political ends seriously and impermissibly undermines public esteem for the impartiality and integrity of the judiciary"].)

### 4. Count Seventeen: Telling Clerk She Was in Contempt

On August 12, 1992, petitioner met in his chambers with a court clerk to discuss her "pending termination from employment." After petitioner informed the clerk of the meeting's purpose and that he was tape-recording their conversation, the clerk replied that she did not want to discuss the issue unless her union representative was present, and she started to leave. Petitioner then stated: "Sit down . . . . I am ordering you to sit down here and talk to me." The clerk left petitioner's chambers. Petitioner followed her and "ordered her back into the office," but "she refused to come" and made a telephone call. As she made the call, petitioner, who was "upset," said "loudly": "[Y]ou are in contempt." Petitioner "does not dispute" the Commission's unanimous finding that he committed prejudicial misconduct in making this statement.

---

[4]In his answer, petitioner stated that the newspaper "may have told [him] that [the picture] would be labeled, 'PAID POLITICAL ADVERTISEMENT.' "

### 5. *Count One A: Ex Parte Communications Regarding Richard Henderson*

After his arrest on June 26, 1994, Richard Henderson was charged with possession of cocaine and marijuana. Petitioner later spoke with Henderson's uncle, who asked petitioner whether Henderson's mother could talk to him about Henderson's case and about helping Henderson with his drug problem. Petitioner replied that she could call him, but advised that she should not discuss the case with him. Henderson's uncle, who is a clergyman, expressed an interest in counseling Henderson.

Henderson's mother telephoned petitioner at his home a few days later to discuss her son's case and to make an appointment to see petitioner. She related Henderson's version of the arrest to petitioner. She also told petitioner that her son had a drug problem and smoked marijuana with his father. She requested that her son receive a heavy sentence that included Christian counseling. Petitioner, who knew the case would be before him, told her the district attorney would decide whether Henderson received drug counseling as part of any disposition. Petitioner did not believe the contact was improper because he viewed it as "a confidential mother asking for help for her son" and he "believed that [Henderson] would not even know of the conversation." Petitioner did not believe Henderson was entitled to know petitioner was communicating with Henderson's family members regarding his drug use. During the conversation, petitioner set up a meeting with Henderson's parents for sometime during the next two weeks.

On August 2, at the beginning of a hearing on Henderson's case, petitioner met with counsel in his chambers and disclosed his discussion with Henderson's parents and uncle about counseling, and the uncle's desire to be involved in the counseling. He also informed counsel that, because of these contacts, he was "out of this case," and the probation department should consider whether Henderson qualified for diversion and counseling.

After the probation department prepared the diversion report, but before a scheduled September 6 diversion hearing, petitioner met with Henderson's parents in his chambers. He gave them a copy of the diversion report and the police report "so they could see the situation there and the problems that they ha[d] with their son." He also advised them about how to deal with Henderson. Henderson's parents again requested that their son receive a heavy sentence that included Christian counseling. Petitioner replied that he could not order someone to receive Christian counseling.

Sometime after Henderson received diversion, his father left a telephone message for petitioner. When petitioner returned the call, Henderson's father

stated that Henderson was not complying with diversion requirements. Petitioner then determined that the probation department had not received notice Henderson was on diversion because the minute order did not reflect this disposition.

The Commission unanimously found that petitioner's ex parte contacts with members of Henderson's family constituted prejudicial misconduct. Petitioner concedes that these contacts "gave 'rise to an appearance of impropriety,'" "could reasonably be considered prejudicial to public esteem for the judicial office," and "constituted prejudicial conduct." ██ ██ ██ (See former Cal. Code Jud. Conduct, now Cal. Code Jud. Ethics, canon 3B(7), adopted eff. Oct. 5, 1992 [prohibiting ex parte communications].)[5]

## B. Contested Charges

### 1. Counts One A and Three: Handling of the Henderson Matter

In connection with the Richard Henderson matter, the Commission also unanimously concluded that petitioner committed prejudicial misconduct in failing to disqualify himself and willful misconduct in directing alteration of court records to mislead the Commission.

#### (a) Count One A: Failure to Disqualify

At the August 2 hearing on Henderson's case, defense counsel stated that Henderson had said petitioner was a friend of Henderson's uncle and that diversion was "a done deal." According to petitioner, on hearing this information, he concluded that Henderson did not deserve diversion because he was using his parents and uncle to manipulate the court. At that point, petitioner determined that his ex parte contacts and his feelings about Henderson had created a conflict and he decided to disqualify himself from making the diversion decision. Petitioner informed counsel of his decision, referred the matter to the probation department for preparation of a diversion report, and scheduled a diversion hearing for September 6. The probation department's report recommended against diversion, finding Henderson statutorily ineligible because of a prior conviction.

---

[5]Although the canons of judicial conduct "do not have the force of law or regulation, they reflect a judicial consensus regarding appropriate behavior, and are helpful in giving content to the constitutional standards under which disciplinary proceedings are charged. [Citations.] [¶] We therefore expect that all judges will comply with the canons. Failure to do so suggests performance below the minimum level necessary to maintain public confidence in the administration of justice." (*Kloepfer* v. *Commission on Judicial Performance* (1989) 49 Cal.3d 826, 838, fn. 6 [264 Cal.Rptr. 100, 782 P.2d 239, 89 A.L.R.4th 235] (*Kloepfer*).) We cite the canons that were effective on the date of the misconduct that petitioner committed.

At the September 6 hearing, the district attorney expressed willingness to consider diversion despite the recommendation. After Henderson's counsel asked the court to consider diversion, petitioner replied: "Well, I don't want to consider it. Number one is because . . . I know his uncle. I've talked to his uncle about getting him diversion and getting him treatment. And because of that, I don't think I should make the decision." Defense counsel then asked: "Should we send it down to Madera Justice Court?" Petitioner replied: "No. I—if you two can work it out, that's fine with me. I'll go along with anything. [¶] I just want to put it on the record that I've talked to his uncle about helping him on a diversion, if he gets diversion. [¶] And I think if I got involved in overruling the Probation Department at this point, I think it would be a conflict."

Contrary to his stated intent, petitioner then discussed with counsel Henderson's prior conviction, the reported level of his drug use, and his family situation, remarking on comments Henderson's uncle had made to petitioner about this subject. When defense counsel suggested getting a second probation report, petitioner replied: "I don't think they're going to change their mind." Counsel then asked: "You don't want to have another report?" Petitioner responded: "No. That would just tick them off." Defense counsel then expressed doubt about the probation department's conclusion regarding statutory eligibility. Petitioner then interjected: "Yeah, well, the problem is, too, it says here, a 'daily use of cocaine.' [¶] And diversion . . . was originated for people who are in danger or might become endangered. When you have a regular user, C.R.C. is the place for them." Petitioner also expressed doubt about the relevance of the fact that Henderson had not been caught using drugs for some time. Finally, petitioner asked: "What do the People want to do?" The district attorney then suggested getting a "rap sheet" and noted "numerous instances" where the court, on the prosecution's recommendation, had overridden the probation department's recommendation. Petitioner replied: "Absolutely. No problem with that. [¶] But I told you I have a conflict with that." At counsel's suggestion, petitioner then continued the diversion hearing to September 20 and set it before himself.

At the hearing on September 20, the district attorney recommended diversion. Petitioner responded: "All right. [¶] I told you that I wasn't going to make the decision in this. It's up to you." Henderson's counsel "ask[ed] for the court's order for diversion even though the [probation] report [did] not seem to be too favorable." Petitioner replied: "All right. [¶] Then . . . under the People's recommendation, I'll grant you diversion." He also directed Henderson to appear on March 21, 1995, for review of his compliance with the terms of diversion. Petitioner later explained to the Commission: "I should have denied the [diversion] request and set the case for

another hearing with another Judge, but knowing that the Court usually goes along with the D.A. recommendation in these type [*sic*] of cases, and the problem of getting a visiting Judge on a Tuesday for one case, I went along with the D.A. and granted diversion."

On this record, the Commission unanimously adopted the special masters' conclusion that petitioner committed prejudicial misconduct by "fail[ing] to disqualify himself after the ex parte communications" and improperly "del-egat[ing] his [judicial] power [to order diversion] away to the District Attorney to avoid a conflict." Petitioner challenges these conclusions, noting that he "fully disclosed his [ex parte] contact," he indicated he did not want to decide the diversion question because of a conflict, the parties did not seek his recusal, and he had no independent duty to disqualify himself. He also challenges the conclusion that he improperly delegated his judicial authority, arguing that diversion was a "foregone conclusion" in this case.

█ We find clear and convincing evidence to support the Commission's conclusions. By statute, a judge "shall be disqualified" if "[f]or any reason (A) the judge believes his or her recusal would further the interests of justice, (B) the judge believes there is a substantial doubt as to his or her capacity to be impartial, or (C) a person aware of the facts might reasonably entertain a doubt that the judge would be able to be impartial." (Code Civ. Proc., § 170.1, subd. (a)(6).) Petitioner was disqualified under this provision; he himself testified before the special masters that he had personal feelings about the propriety of granting diversion and that he should therefore not participate in the decision, based on his ex parte communications and Henderson's comment to his attorney that diversion was "a done deal." As petitioner later explained to the Commission: "I wasn't going to make the [diversion] decision, because I felt if I denied diversion it would look like I was mad at them, which I was. [¶] I was very angry at Mr. Henderson for playing games with his family . . . . And I felt that I needed to get out of the case." Disqualification based on the judge's "personal bias or prejudice concerning a party" may not be waived. (Code Civ. Proc., § 170.3, subd. (b)(2)(A).) Moreover, even as to waivable disqualifications, a waiver must be written, "signed by all parties and their attorneys and filed in the record." (Code Civ. Proc., § 170.3, subd. (b)(1); see *Adams* v. *Commission on Judicial Performance* (1995) 10 Cal.4th 866, 906 [42 Cal.Rptr.2d 606, 897 P.2d 544] (*Adams*).) Thus, petitioner's suggestion that the parties waived the disquali-fication is unconvincing.

We also agree that petitioner improperly delegated his judicial authority regarding diversion to the district attorney. Petitioner incorrectly contends that, because diversion was a "foregone conclusion" in this case, delegating

this decision did not constitute prejudicial misconduct. Regardless of the likelihood that Henderson would receive diversion, as petitioner conceded during the Commission proceedings, "legally it was [petitioner's] decision," and he "should have . . . set the case for another hearing with another Judge" rather than address his conflict by ceding his power to the district attorney. Petitioner's decision to follow the latter course constituted prejudicial misconduct. (See *McCartney* v. *Commission on Judicial Qualifications* (1974) 12 Cal.3d 512, 532 [116 Cal.Rptr. 260, 526 P.2d 268] (*McCartney*) [judge improperly delegated judicial power and committed misconduct by imposing sentences bailiff suggested]; cf. *Fewel* v. *Fewel* (1943) 23 Cal.2d 431, 436 [144 P.2d 592] [judicial decisionmaking " 'may not be delegated to investigators or other subordinate officials or attachés of the court, or anyone else' "].)

(b) *Count Three: Alteration of Court Records*

The record contains three documents entitled "Notice, Sentence, Commitment Form" that purport to memorialize Henderson's September 20 diversion hearing. As to disposition, the first, exhibit No. 17, is blank. The second, exhibit No. 18, appears to be a copy of the first with addition of the following handwritten entry for Henderson's sentence: "Formal Diversion granted. Father to find counselling program."[6] The third, exhibit No. 19, appears to be a copy of the second with a handwritten addition indicating, "per Dan Pursell," who was the district attorney on the case. Toward the bottom of the form, the following phrase was added to exhibit No. 19: "Judge Fletcher Disqualifies himself for any violation of Diversion Hearings." Finally, a handwritten "Post-it" note attached to exhibit No. 19 stated: "Judge Fletcher—disq. himself."

On October 26, one of the court clerks, Fran Saunders, faxed exhibit No. 18 to the probation department to inform it of the diversion disposition. On October 25, the Commission sent petitioner a letter of inquiry regarding the ex parte contacts and the grant of diversion in the Henderson matter. Petitioner's December 30 response to the Commission letter attached a copy of exhibit No. 19, but did not inform the Commission that the exhibit contained entries that did not appear on exhibit No. 18. On November 2, the Commission obtained a copy of exhibit No. 18 from the probation department as part of the investigation of petitioner. In January 1995, the Commission asked petitioner to comment on allegations that, between October 26, 1994, and his December 30 response to the Commission, during the Commission's investigation, he directed alteration of the original minute order.

---

[6]The second document also indicates an additional address for Henderson.

Saunders testified as follows regarding preparation of these documents: On September 20, 1994, or sometime after that date but before October 26, she prepared a minute order in the form of exhibit No. 18.[7] She received a telephone call from the probation department regarding the status of the case. In response to the inquiry, on October 26, she faxed the probation department a copy of the then existing minute order, which was in the form of exhibit No. 18.[8] A few days later, petitioner approached Saunders and directed her to change the minute order to reflect that he had disqualified himself from future hearings in the case and that diversion was granted "per Dan Pursell." She asked petitioner whether he wanted her to prepare an amended minute order, because the court's policy was to prepare amended orders when existing orders were changed. Petitioner "said no, he didn't, just to change it." Saunders did not recall petitioner's stating in court on September 20 that he was disqualifying himself from hearings on diversion violations. She testified that the minute order she originally prepared would have reflected that disqualification had she heard petitioner make that statement.

■ On this record, we agree with the Commission's unanimous conclusion that petitioner committed willful misconduct in his handling of the minute orders. Petitioner directed the clerk to alter a minute order and, contrary to court policy, not to indicate she had changed the order. The evidence strongly suggests he took this action after receiving the Commission's inquiry about his ex parte communications in the case. Petitioner told the Commission he received the inquiry within 48 hours of an October 26 telephone conversation with Henderson's father, and Saunders testified that petitioner directed her to alter the minute order within a few days of that date. In any event, petitioner submitted a copy of exhibit No. 19 to the Commission with his December 30 response without disclosing that he had directed alteration of the minute order to support his explanation of the events in the Henderson case. Petitioner's actions in this regard constituted willful misconduct. (See *Wenger v. Commission on Judicial Performance* (1981) 29 Cal.3d 615, 643-645 [175 Cal.Rptr. 420, 630 P.2d 954] (*Wenger*) [backdating affidavit was willful misconduct].)

In defense of his actions, petitioner argues that he did not commit willful misconduct because the alterations simply conformed the minute orders to

---

[7]The testimony was uncertain regarding the origin of exhibit No. 17, the blank minute order that Henderson signed. The official court file did not contain a copy of an order in this form. Both Saunders and the court's supervising clerk speculated that exhibit No. 17 was a copy of a minute order that was prematurely distributed to the parties at the September 20 hearing before the proceedings were completed and the appropriate entries were made.

[8]Saunders did not recall petitioner's telling her that the minute order was incorrect and incomplete or asking her to send a copy of a corrected order to the probation department.

the docket entry for the September 20 hearing, which petitioner asserts "was completed contemporaneously with the court session" and constituted the court's "official minutes." This docket entry, petitioner maintains, "was the source of all of the material added to Exhibit 17, to make Exhibits 18 and 19 in order to accurately reflect what had occurred." "This being so," petitioner continues, "Exhibits 17, 18 and 19 are merely draft documents that cannot be 'altered' and would not mislead experienced readers." According to petitioner, "[t]he editing of a draft document cannot be an impermissible alteration if the draft document is, as yet, incomplete."

For several reasons, petitioner's response is unpersuasive. First, regardless of the docket entry, the fact remains that, during the Commission's investigation of the Henderson matter, including petitioner's role in granting diversion, petitioner directed alteration of the order, directed that the order not indicate that it had been altered, and sent the Commission a copy of the altered order without detailing the circumstances. By forwarding only the altered order, petitioner presented the Commission with a grossly incomplete and misleading response. (See *Adams, supra,* 10 Cal.4th at pp. 910-911 [judge's inaccurate and incomplete responses to the Commission constituted willful misconduct].)

Second, the record contradicts petitioner's contention that the docket entry reflects *all* of the information added to the orders. The entry states: "Diversion granted; Judge Fletcher disq. himself for any violation of Diversion hrgs." Although this entry reflects petitioner's disqualification on *future* diversion violation hearings, it does *not* indicate that diversion was granted "per Dan Pursell." This alteration of the order was important to support petitioner's claim that, because he had disqualified himself, he let the prosecutor make the initial diversion decision.

Third, the record also does not support petitioner's claim that the docket entry was "completed contemporaneously with" the September 20 hearing. The initials of the supervising clerk, Velma Dee Buchanan, appear beside the docket entry, indicating that she made it. However, Buchanan was not the clerk for the September 20 hearing; Saunders was. Moreover, Buchanan learned about petitioner's alleged disqualification sometime after September 20, when petitioner discovered that the case file did not reflect disqualification and informed Buchanan of the situation. The record thus suggests that Buchanan made the docket entry sometime after, and not contemporaneously with, the September 20 hearing.

Fourth, a conflict exists between the docket entry and the reporter's transcript of the September 20 hearing. Unlike the docket entry, but consistent with Saunders's recollection, the hearing transcript does not reflect that

petitioner disqualified himself from *future* diversion violation hearings. On the contrary, it shows that petitioner ordered the parties to appear before him again on March 21, 1995, for a compliance review hearing. Consistent with the transcript, on March 21, 1995, Henderson appeared before petitioner for a diversion review hearing.[9] Given all of the circumstances we have detailed, and the court reporter's certification that the transcript "comprise[d] a full, true, and correct transcript" of the September 20 hearing, we afford the reporter's transcript more credence than the docket entry. (See *People* v. *Smith* (1983) 33 Cal.3d 596, 599 [189 Cal.Rptr. 862, 659 P.2d 1152].)

Finally, petitioner's current contention that it was unnecessary to mark the altered orders as "corrected" stands in stark contrast to his position *and* the uncontradicted testimony before the special masters. In addition to Saunders's testimony regarding court policy, which we have already discussed, petitioner testified that Saunders should have followed court procedures for preparing an amended minute order in complying with his order to make the alterations. While cross-examining Saunders, he reiterated that court policy required her to indicate on the altered order that it was "corrected or amended," and he challenged her testimony that he "told [her] to break that policy and violate the law." And, in closing argument to the Commission, petitioner again stressed that, "if [clerks] add anything to a minute order after the defendant signed, they are supposed to mark it amended and supposed [to] get the defendant to agree to it." Buchanan, the court's supervising clerk, confirmed petitioner's position, testifying that court policy prohibits clerks from altering signed minute orders like exhibit No. 18 without indicating across the top that they are corrected orders and distributing copies to all parties. She also testified that petitioner's policy was to ask for preparation of a corrected minute order if he discovered that a minute order did not reflect his verbal order. Thus, petitioner's current position is directly contrary to the uncontradicted evidence in the record.

Indeed, petitioner's newly minted explanation is just another example of his vague and contradictory representations throughout these disciplinary proceedings regarding these documents. Petitioner maintains that Saunders faxed exhibit No. 18 to the probation department at his request after he learned from Henderson's father on October 26 that Henderson was not complying with diversion requirements. In his February 1995 response to the Commission's January 1995 inquiry about the matter, petitioner stated: "I don't recall looking at the minute order or the file on 10-26-94." Regarding the differences between exhibit Nos. 18 and 19, he stated: "The only explanation I can offer is that Ms. Saunders sent a FAX copy to the probation department and then added the rest at some later time." In his answer to the

---

[9]The minute order for that hearing indicates: "Need visiting Judge."

Commission's notice of formal proceedings, petitioner gave a different account. He there maintained that, after receiving the call from Henderson's father on October 26, he "pulled the file," discovered that the minute order did not correctly reflect that Henderson had been granted diversion pursuant to the district attorney's "decision" and that petitioner had disqualified himself, and "ordered" Saunders to make the necessary corrections and send it to the probation department. Petitioner's testimony before the special masters was initially consistent with this latter account, although he additionally noted that the minute order he found in the file on October 26 was in the form of exhibit No. 18.[10] However, after being confronted with his previous position in his February response, petitioner began to waver as to whether he looked at the file after the October 26 phone call. Later, in arguing his case to the Commission, petitioner changed his account once again. He told the Commission that his "only order to Ms. Saunders was to fax" the minute order to the probation department. Contrary to his testimony before the special masters, petitioner told the Commission that he had not ordered Saunders to amend the minute order. When asked whether he "direct[ed] her to change it in any way," petitioner replied, "No, I did not," and he suggested that Saunders made the changes on her own initiative.[11] Of course, as we have explained, petitioner has shifted his position yet again in this court, conceding that he directed Saunders to prepare a corrected minute order, but arguing that this action did not constitute misconduct because the altered documents were merely incomplete draft orders.

Petitioner's representations regarding his disclosures to the Commission on this topic are similarly confused and inconsistent. Petitioner initially testified that, with his December 30 response to the Commission's inquiry about ex parte communications, he sent copies of both exhibit Nos. 18 and 19 to show that the order had been altered. He then explained that he obtained a copy of exhibit No. 18 on October 26 when he reviewed the file after talking with Henderson's father. Later, however, he testified that he copied exhibit Nos. 18 and 19 when he received the Commission's inquiry about the matter. He also later testified that he sent the exhibits, not with his December 30 response, but with his February 1995 response to the Commission's January 1995 inquiry about the altered minute orders. Regarding his submission of minute orders to the Commission, he then testified: "I'm sorry. I don't recall now. . . . I remember sending two minute orders, but I don't remember which they were and when I looked at them . . . ." Later, petitioner again testified that he sent the two minute orders in response to the

---

[10]This testimony supports Saunders's testimony that she prepared a minute order in the form of exhibit No. 18 before October 26.

[11]During his testimony before the special masters, petitioner suggested that Saunders had made changes "to make it look like [he] was falsifying documents."

Commission's January 1995 inquiry, but he could not recall how he got a copy of the order in the form of exhibit No. 18. Before the Commission, however, petitioner appeared to state that he first received a copy of the minute order in the form of exhibit No. 18 from the Commission as part of its January 1995 inquiry. This last statement was consistent with the Commission's position that petitioner never submitted a copy of a minute order in the form of exhibit No. 18 and that he had only submitted a copy of exhibit No. 19. Petitioner's continually shifting explanations regarding these exhibits are further evidence of his willful misconduct in attempting to deceive the Commission. (See *Adams, supra,* 10 Cal.4th at pp. 910-911 [judge's inaccurate and incomplete responses to the Commission constituted willful misconduct].)

2. *Count One B: Ex Parte Contacts With Peter Vanderputten*

In connection with the dissolution of his marriage, Peter Vanderputten was criminally charged with violating court orders, violating a protective order, and allowing or causing a child to suffer. Under an agreement with the district attorney, Vanderputten pleaded guilty to the charges, and sentencing was continued, with dismissal to follow after a year if he committed no further violations and obeyed court orders. The case remained pending before petitioner until he dismissed the charges in accordance with the plea agreement. During that time, Vanderputten often appeared before petitioner for compliance review. At some point, Vanderputten talked about committing suicide and other violent acts. In response, and to protect Vanderputten and his family, petitioner recommended that Vanderputten seek counseling. As an alternative, petitioner advised Vanderputten that he was welcome to attend a Saturday morning men's fellowship group that petitioner led. Vanderputten attended petitioner's fellowship group a few times. The men at the group were "supporting him and trying to get him to leave his wife alone, and . . . obey all laws, to act like a reasonable person."

On this record, we agree with the Commission's unanimous conclusion that petitioner committed prejudicial misconduct by engaging in improper ex parte contacts with Vanderputten. (See former Cal. Code Jud. Conduct, canon 3A(4), as adopted eff. Jan. 1, 1975, see now Cal. Code Jud. Ethics, canon 3B(7).) The evidence clearly shows that at petitioner's fellowship meetings Vanderputten discussed the very problems that led to the criminal charges pending before petitioner and his difficulties in accepting the situation. By his own admission, petitioner viewed himself as Vanderputten's probation officer. In one of his responses to the Commission, petitioner conceded that, because of these ex parte contacts, he "would have had to disqualify [him]self" from hearing allegations that Vanderputten

violated his plea bargain. We agree with petitioner's concession and conclude that he committed prejudicial misconduct with regard to Vanderputten. (See Code Civ. Proc., § 170.1, subd. (a)(6).)

We reject petitioner's claim that this conclusion violates his constitutional right to practice his religion. While presiding over a pending criminal case and after recommending that a defendant obtain counseling, petitioner invited that defendant to petitioner's fellowship group specifically to discuss and address the problems underlying the criminal charges. That, as part of addressing those problems, the group members would look to the Bible for guidance does not make our inquiry regarding petitioner's conduct an issue of religious freedom. As a judge, petitioner may not participate in an ongoing support group where defendants with cases pending before him discuss their attempts to comply with the terms of their plea bargains.[12]

### 3. *Count One C: Ex Parte Contacts With Dennis Jonathan*

In January 1991, Dennis Jonathan was charged with driving with an illegal blood-alcohol concentration and having a prior drunk driving conviction. On March 25, he appeared with counsel before petitioner, pleaded guilty to the charge, and admitted the prior conviction. Petitioner accepted the plea and then offered to postpone sentencing "for a couple months and see how [Jonathan was] doing on [his] programs," i.e., so Jonathan could "prove to the court that [he] ha[d] control over [his] drinking." After Jonathan accepted petitioner's offer, petitioner stated: "I do have personal knowledge of Mr. Jonathan and his programs, by the way." Jonathan's counsel replied that she was aware of this fact. No one was at the hearing for the prosecution.

Petitioner's acquaintance with Jonathan began when he offered to help petitioner get elected. Petitioner next saw Jonathan in late 1988, when he appeared before petitioner on a hit-and-run charge. According to petitioner, he disclosed to counsel during that proceeding that he knew Jonathan from the campaign, that he "felt uncomfortable in sentencing Mr. Jonathan, [and] that the only way [he] would hear the case . . . was that the sentence would be agreed between [counsel] . . . ." Petitioner was concerned "that Mr. Jonathan might think he got a special favor . . . ." Petitioner next saw Jonathan at the church that petitioner and Jonathan's parents attended. Later, in 1989, Jonathan appeared before petitioner on his first drunk driving

---

[12]We also reject petitioner's suggestion that he received inadequate notice of this charge. In its second amended notice of formal proceedings, the Commission cited Vanderputten's attendance at the "men's prayer breakfast group on Saturday mornings" as an example of petitioner's "engag[ing] in improper ex parte communications," "fail[ing] to disqualify [him]self" despite ex parte communications, and "tak[ing] action which appeared unusually lenient toward defendants after engaging in ex parte communications." These allegations afforded petitioner ample notice regarding the Vanderputten case.

charge. After taking Jonathan's guilty plea, petitioner sentenced him to the "usual" sentence for first-time offenders.

After his first drunk driving conviction, Jonathan began attending petitioner's Saturday morning men's fellowship group. Before his 1991 arrest, Jonathan attended group meetings approximately once a month for six to eight months. At group meetings, Jonathan disclosed that he was an alcoholic and that he needed help. After his 1991 arrest, but before sentencing, Jonathan attended two or three more group meetings. At a meeting before his first court appearance, he informed petitioner that he had " 'made a terrible mistake, . . . slipped on [his] sobriety and . . . received a ticket for driving under the influence.' "[13] According to Jonathan, petitioner "was sympathetic."

Petitioner testified that he decided to leave Jonathan's sentence to the agreement of counsel because of these contacts. Petitioner was concerned that, if he sentenced Jonathan, "the appearance might be that [petitioner] . . . was lenient, no matter what [he] did." Petitioner "didn't want anyone to say that [he] was lenient . . . because [Jonathan] got people to vote for [petitioner] and his parents went to the [church petitioner] attended." According to petitioner, he advised the district attorney that he knew Jonathan, that he would preside in the case if counsel did not object, but that he would leave it to counsel to agree on the sentence because of his concern about claims of leniency. The district attorney, however, did not recall that petitioner made any of these disclosures.

Because Jonathan needed to get to work, he appeared for sentencing on July 30 before court was in session. Sentencing occurred in petitioner's chambers. The district attorney was present, but defense counsel was not. Petitioner had contacted defense counsel about the matter, and she had replied that her attendance was unnecessary because she knew what the sentence would be. She and the district attorney had agreed to recommend a sentence of a fine and jail time. According to petitioner, Jonathan waived his right to have counsel appear for sentencing; there is no record of the proceedings to verify petitioner's claim. Notwithstanding his purported decision to leave Jonathan's sentence to counsel, petitioner proposed that, in lieu of the fine and jail sentence, Jonathan be required to perform community service in the form of construction work on a proposed addition to the courthouse. Petitioner eventually imposed this sentence. The district attorney characterized this sentence as "unusual," noting that in 99 percent of the cases of second-time offenders, service of a minimum 10-day jail sentence is required.

---

[13]Petitioner is thus incorrect in asserting that "no discussion of the case took place" at the fellowship meetings.

Over a year later, petitioner saw Jonathan in the court clerk's office. With no attorneys present, he informed Jonathan that the addition to the courthouse had not been approved and that he would have to perform his community service in another way. Petitioner asked Jonathan how he wanted to fulfill his sentence. According to Jonathan, petitioner gave him a list of options from which to choose. Petitioner then modified Jonathan's sentence in accordance with Jonathan's preference.

■ On this record, we agree with the Commission's unanimous conclusion that petitioner committed prejudicial misconduct in handling the Jonathan matter. As in the Henderson matter, petitioner recognized that his ex parte contacts with Jonathan created a conflict, and his initial solution was simply to cede the sentencing decision to counsel. He did not disclose his ex parte contacts to the district attorney, and there is no evidence that he disclosed even to defense counsel that he had discussed the offense with Jonathan at a fellowship meeting. Moreover, despite his ex parte contacts and his decision not to participate in sentencing, petitioner took control of sentencing and imposed an unusually lenient sentence that included no actual jail time. Petitioner himself admitted that suspension of the jail sentence and fine was not part of "the normal sentence" for a second drunk driving offense. Over a year later, petitioner modified the sentence through additional ex parte contacts with Jonathan, without involvement of either defense counsel or the district attorney. The record thus contains clear and convincing evidence that petitioner committed prejudicial misconduct in his handling of the Jonathan matter. (See former Cal. Code Jud. Conduct, canon 3A(4), as adopted eff. Jan. 1, 1975, see now Cal. Code Jud. Ethics, canon 3B(7); Code Civ. Proc., § 170.1, subd. (a)(6).)

We reject petitioner's claim that Jonathan's sentence was "within customary local guidelines for the rare, or exceptional case." The record shows that service of jail time was not required only where a single parent could not care for her small children during incarceration or the defendant had a physical problem or was elderly. Petitioner has identified no circumstance that justified treating the Jonathan matter as an exceptional case.

4. *Count One D: Ex Parte Contacts With Robert Reagan, Jr.*

Robert Reagan, Jr., approached petitioner "at [a] restaurant and complained about a speeding violation and told [petitioner] he did not have the money to pay for it." Petitioner "knew" Reagan "by his many appearance[s] in court." Petitioner and Reagan also had attended the same school functions because their children had attended the same school for at least 10 years. Petitioner replied that Reagan "could do community service for the fine. Mr.

Reagan agreed and [petitioner] gave him a couple of month[s] to complete and show proof." Petitioner also told Reagan that he had to attend traffic school. Petitioner then "went back to court," "pulled the file," and indicated that he had given Reagan "an extension" to perform his community service. A few months later, a warrant issued because Reagan had not paid his fine. In court, Reagan stated that "he did not understand what had happen[ed] and asked for another chance to do the service and attend traffic school . . . ." In his response to the Commission charges, petitioner stated: "Because I had handled it, and I did not have a clerk do it, I felt that I should give him one more chance, and if he failed this time, it would be properly documented by a clerk. Then he would be charged with failure to pay."

■ We agree with the Commission's unanimous finding that petitioner committed prejudicial misconduct in handling the Reagan matter. (See former Cal. Code Jud. Conduct, canon 3A(4), as adopted eff. Jan. 1, 1975, see now Cal. Code Jud. Ethics, canon 3B(7); Code Civ. Proc., § 170.1, subd. (a)(6).) Petitioner informally discussed Reagan's situation at the restaurant and agreed to give him an extension of time in order to perform community service in lieu of a fine. Petitioner then altered the official court file to reflect his informal handling of the matter. According to petitioner's own response, his ex parte handling of this matter confused Reagan and required him to give Reagan still another chance after a warrant was issued when he failed either to pay or to perform community service.

### 5. *Count One E: Ex Parte Contacts With Steven Pearson*

In July 1990, petitioner placed Steven Pearson on probation after he pleaded guilty to brandishing a firearm. Sometime after sentencing, Pearson began attending petitioner's Saturday morning fellowship meetings. According to petitioner, Pearson had "serious spousal abuse problems," was a "very sick man," and had a "very violent temper." Pearson discussed, and petitioner counseled him about, these problems during the fellowship meetings. Pearson became "a real problem" for petitioner and his wife, and they had "to discourage him from seeking [them] out."

While Pearson was on probation, he and his wife were charged with violating zoning laws by keeping piles of junk in their yard. Petitioner was personally aware of the circumstances underlying the charge; he had stopped by Pearson's property, seen the junk in the yard, and advised Pearson to dispose of it. Petitioner believed that Pearson, and not his wife, was responsible for the violation, and petitioner told the district attorney of his belief. According to petitioner, he also told the district attorney he was disqualifying himself from hearing the case. The district attorney, however, did not

recall petitioner's saying anything about the Pearsons or whether he had a problem with them.

Consistent with his practice in similar cases, the district attorney asked that the matter be continued until, and dismissed when, the Pearsons cleaned up their property. At the district attorney's request, petitioner continued the matter two or three times. Petitioner did not believe that the conflict created by his ex parte contacts and his knowledge of the zoning violation prevented him from ordering a continuance. However, petitioner also believed that the district attorney gave Pearson too much time to clean up the property and should have forced Pearson to act more quickly. Petitioner remembered that Pearson's earlier brandishing offense involved a neighbor who was angry about junk in Pearson's yard.

On this record, we agree with the Commission's unanimous finding that petitioner committed prejudicial misconduct in continuing to preside over the zoning case despite his personal knowledge of the relevant circumstances and his ongoing personal relationship with Pearson through the fellowship meetings. Because of the conflict that these contacts created, petitioner exercised no substantive judgment in considering the district attorney's continuance requests. By his own admission, petitioner thought the district attorney was giving Pearson too much time to clean up his property, creating a potential for another confrontation with his neighbor. But for his decision not to make substantive rulings in this case, petitioner might not have acceded to all of the continuance requests. Rather than participating in the case under these circumstances, he should have recused himself. (See former Cal. Code Jud. Conduct, canon 3A(4), as adopted eff. Jan. 1, 1975, see now Cal. Code Jud. Ethics, canon 3B(7); Code Civ. Proc., § 170.1, subd. (a)(6).) In failing to do so, he committed prejudicial misconduct.

6. *Count One F: Ex Parte Contacts With Witnesses*

On July 27, 1993, Eddie Riegle appeared without counsel before petitioner for arraignment on a misdemeanor charge of assault with a deadly weapon (a BB rifle). The district attorney requested a brief continuance for plea negotiations, indicating his belief that the shooting was accidental. He wanted to discuss the incident with the victim. He also wanted to investigate how various sentence requirements would affect Riegle's Army service, which was to begin the next month.

On August 3, Riegle again appeared before petitioner without counsel. Under a plea bargain, the district attorney proposed that Riegle plead guilty

to simple battery and receive a sentence of eight days of community service and a fine. The district attorney explained that he had discussed the sentence with the victim, who had no objection. Petitioner then suggested that Riegle serve eight days in jail in lieu of the community service. Gary Whitley, a friend of Riegle's who was an inactive attorney and who was appearing as a character witness, responded that the Army would not accept Riegle under that sentence. Petitioner replied that the charge was too serious for a sentence of only eight days of community service. Petitioner then granted Riegle's request for time to consider the matter, and Riegle left the courtroom.

When Riegle returned and his case was called again, Kimberly Fletcher, the public defender, accompanied him and attempted to negotiate with petitioner for the sentence the district attorney had proposed. During this period, and while on the bench, petitioner telephoned both the victim and the park ranger who arrested Riegle. Because both were unavailable, petitioner left messages for them.

While court was still in session, the ranger returned petitioner's call. Petitioner took the call at the bench, but did not put it on the speaker phone, so Riegle and counsel could hear only petitioner's side of the conversation. According to petitioner, he intended to put the call on the speaker phone, but decided not to because the ranger became irate upon learning of the proposed plea bargain. Petitioner repeated in open court parts of his conversation with the ranger as it occurred and related more of it after the call ended. The evidence consistently showed that, during the call, petitioner referred to Riegle as a "punk" and made comments like, "That's what I thought. Bad attitude." After the call, petitioner again stated: "Just what I thought. This ranger has affirmed that he had a bad attitude. He's a punk kid." Petitioner also expressed the opinion that Riegle should be tried and that he would be convicted. Petitioner also stated that he would not accept the negotiated plea bargain.

▮▮ On this record, we agree with the Commission's unanimous conclusion that petitioner committed prejudicial misconduct by making ex parte contacts with the ranger during the Riegle matter.[14] (See former Cal. Code Jud. Conduct, canon 3B(7), as adopted eff. Oct. 5, 1992, now Cal. Code Jud. Ethics, canon 3B(7); Code Civ. Proc., §170.1, subd. (a)(6).) Petitioner's

---

[14]The Commission charged that petitioner "frequently telephoned victim witnesses and/or law enforcement personnel from court during pretrial proceedings to obtain their views and information concerning matters before [him]." However, the record contains only scant evidence of contacts other than in the Riegle matter. A court reporter testified generally that petitioner had made such calls six to twelve times, but could not recall a specific incident other than the Riegle matter. Similarly, an attorney who appeared before petitioner testified

asserted concern about embarrassing the ranger does not excuse his decision to exclude counsel and the defendant from a conversation in which he obtained information that influenced his handling of the case.

Contrary to petitioner's assertion, the evidence in the record does not show the parties stipulated that petitioner could make these calls or exclude them from his conversation with the ranger. According to Whitley, petitioner made the calls "[w]ithout telling anyone what he was going to do." Kimberly Fletcher similarly testified that no one suggested petitioner make these calls; he acted "spontaneously," and "on [his] own." Consistent with this evidence, the hearing transcript does not reflect that petitioner either requested or received stipulations to his ex parte contact with the ranger.[15]

### 7. Count One G: Ex Parte Contacts Regarding Bench Warrants

The Commission alleged that, on numerous occasions, petitioner "telephoned defendants, including defendants [he] knew, for whom bench warrants had been issued to advise them to come to court." In his answer and testimony, petitioner admitted that he made these calls approximately 25 to 30 times. Petitioner explained that he informed these individuals the court was processing a warrant on them and that the warrant would not issue if they appeared in court. Before placing the calls, petitioner did not inform the district attorney or determine whether the individuals had counsel. Nor did he ask about this latter fact during the calls. In petitioner's view, this practice saved time for the understaffed clerk's office, by eliminating the need to process warrants for those who responded to petitioner's calls. Petitioner discontinued this practice when another judge informed him that it might violate the separation of powers doctrine and create conflicts.

 We agree with the Commission's unanimous finding that petitioner committed prejudicial misconduct in making these ex parte contacts. Petitioner should not have conducted court business through informal, ex parte contacts over the telephone. (See former Cal. Code Jud. Conduct, canon 3A(4), as adopted eff. Jan. 1, 1975, see now Cal. Code Jud. Ethics, canon 3B(7).) In his petition, petitioner insists that his primary motivation was to clear up improper arrest warrants for persons who were not lawfully subject to arrest. The evidence does not support this contention, but shows instead

---

that petitioner made such calls from the bench over counsel's objection, but she could not identify specific incidents.

[15]In arguing to the contrary, petitioner cites the district attorney's testimony that, "on a number of occasions," petitioner made telephone calls when he wanted to verify information relating to a proposed settlement, and that "counsel" stipulated to these contacts. However, this testimony described only petitioner's general practice and did not specifically address the Riegle incident.

that petitioner simply believed that his informal handling of these warrants was the most efficient way to conduct the court's business. In any event, petitioner's speculation "that maybe some of [the arrest warrants] were improper" does not excuse his decision to address this problem through ex parte telephone contacts.

### 8. Count Eight: Prejudgment of Evidence in the Wickham Matter

On November 1, 1994, petitioner presided over a preliminary hearing on a felony drunk driving charge against Aaron Wickham. At the outset of the hearing, defense counsel explained that Jon Fry was the driver of the car and could "completely exculpate" Wickham, and that a continuance was necessary to subpoena Fry. After petitioner heard testimony from the arresting officers and Wickham, defense counsel again requested a continuance because of Fry's absence. Petitioner proposed a week's continuance, and defense counsel objected, arguing that Wickham should not have to remain in custody that long "when he's got a guy to come in to say that he wasn't driving." Petitioner then explained that credibility determinations would be made by the jury during trial, not by the court during the preliminary hearing.

Defense counsel then asked whether petitioner was saying "that [he] wouldn't believe [Fry]." Petitioner replied: "This court has dealt with Jon [Fry] many, many times, and his credibility is not too high." Counsel objected that petitioner was "prejudging [Fry's] testimony." Petitioner replied: "No. I'm just warning counsel that he has come into this Court and he's been before this court many times. And he's broken many promises to this court and has many failures to appear in court. And I hope you don't expect the court to regard his testimony like any other citizen in the community." Petitioner suggested that he might dismiss the case if Wickham got the prosecution's sole eyewitness to admit she had lied to the police, and then explained: "But when you want me to waive [sic] who believes who and who witnesses things, that's the jury's job; that's not the court's job." Petitioner then stated that he did not "believe [the prosecution witness] would have much more credibility in this court than Jon [Fry]. They're both recovering alcoholics that are working hard to try to stay out of trouble." Defense counsel then interjected, "So you can't believe one or the other really." Petitioner replied: "Right. It's a tie." After defense counsel started to express hope that petitioner "might be convinced by—," petitioner interrupted and said, "I'm willing to listen." Petitioner also expressed skepticism about Fry's testimony, noting that he had failed to say anything when he was in court during Wickham's arraignment. Petitioner explained: "What I'm trying to say, Counsel, is why didn't [Fry] volunteer that information to the court if he knew his friend was being charged with him driving the car?"

According to petitioner, he believed that defense counsel would withdraw the continuance request after hearing petitioner's remarks about Fry. In his testimony before the special masters, petitioner explained: "I was trying to convince [defense counsel] that we should end th[e] preliminary hearing; that the Court ha[d] heard enough to hold the defendant to answer . . . ." Knowing that defense counsel was unfamiliar with Fry's background, petitioner made his remarks "with anticipation that [defense counsel] would see the futility of prolonging the hearing and wasting court time." Petitioner also stated that, based in part on his view of Fry's "credibility," petitioner "wouldn't have changed [his] mind" even if Fry had testified at the preliminary hearing that he had been the driver.

■ On this record, we agree with the Commission's unanimous conclusion that petitioner committed prejudicial misconduct during the Wickham case by expressing prejudgment of Fry's credibility. The record does not support petitioner's contention, raised for the first time in this court, that he was simply fulfilling his duty as a judge to disclose his personal knowledge and opinion of a defense witness. Petitioner's contention is inconsistent with his failure to disclose his opinion of Fry at the start of the preliminary hearing despite his knowledge that Fry was Wickham's primary witness; petitioner waited until after hearing the arresting officers' testimony before informing defense counsel. More importantly, by his own admission, petitioner made his remarks to persuade defense counsel not to call Fry and to agree to end the preliminary hearing. Indeed, contrary to his current position that he made his remarks simply to fulfill some ethical or judicial duty, petitioner acknowledged in his answer to the Commission's allegations "that there is no excuses [sic] for putting on the record, the past performances and opinions of the witnesses." We agree with petitioner's earlier assessment of his conduct. His attempt to influence counsel's handling of the case by disclosing his bias against Wickham's primary witness and his prejudgment of that witness's credibility constituted prejudicial misconduct. (See *Dodds*, *supra*, 12 Cal.4th at p. 176 [judge's "prejudgment in the handling of cases . . . constituted prejudicial conduct"]; *Roberts* v. *Commission on Judicial Performance* (1983) 33 Cal.3d 739, 744-745, 748 [190 Cal.Rptr. 910, 661 P.2d 1064]; *McCartney*, *supra*, 12 Cal.3d at p. 533 [in examining witness, judge "may *not* . . . become an advocate for either party or cast aspersions or ridicule upon a witness"].)

9. *Counts Eleven A, Eleven C: Inappropriate Reactions to Disqualification Attempts*

(a) *Count Eleven A: Riegle Matter*

As we have previously set forth, on August 3, 1993, defendant Eddie Riegle appeared before petitioner without counsel, accompanied only by

Gary Whitley, an inactive attorney who was present as a character witness. After refusing to accept the negotiated plea bargain and insisting that Riegle serve time in jail, petitioner granted Riegle's request for time to consider the matter, and Riegle left the courtroom. Kimberly Fletcher, the public defender, was present in court at the time and observed these proceedings.

As Riegle and Whitley left the courtroom, they asked Fletcher to accompany them. After determining that Riegle qualified for representation by the public defender, Fletcher returned to the courtroom with Riegle, informed petitioner that Riegle qualified for representation and had asked her to represent him, and asked to be heard on the matter. According to Fletcher, she "started to negotiate on" Riegle's behalf, and petitioner "talked to [her] as though [she] was the attorney of record." At this point, Fletcher believed she was representing Riegle, because petitioner's previous practice in similar circumstances had been to accept her representation without formally stating that he was appointing the public defender. Fletcher repeatedly asked petitioner to "go on the record," but petitioner refused.

As we have also previously explained, during the court proceedings, petitioner discussed the matter by telephone with the park ranger who had arrested Riegle. Given petitioner's comments about Riegle after the call, Fletcher concluded that petitioner could not be fair and impartial, and she indicated that she would attempt to disqualify him. Although Fletcher had been discussing the case with petitioner for at least 10 minutes at this point, petitioner replied that Fletcher was interfering in a case in which she had not been appointed. Fletcher reminded petitioner that in the outer hall she had qualified Riegle for representation and that petitioner had been dealing with her as Riegle's attorney. Petitioner then suggested that Riegle did not qualify for representation, and he asked for a qualification form. He had not previously made a similar request of Fletcher during her almost four years as public defender, and he had not mentioned a concern about Riegle's eligibility for public representation before Fletcher's remark about disqualification. Fletcher cited these facts as further evidence of petitioner's bias in the case. Petitioner replied: "Fine. You're emotionally involved in this case. You're way out of line, and I'm going to remove you and appoint conflict counsel." Petitioner did not, at this point, refer to Riegle's qualification for public representation.

When petitioner finally called the case, he indicated that Riegle was requesting a public defender and that he was appointing Linda Thompson instead of Fletcher. Fletcher objected, explaining that no conflict existed and that petitioner had refused to call the case, had asked for a public defender application, and had stated unsupported conclusions about Riegle's eligibility for representation. Petitioner then stated: "The record should also reflect

that Ms. Fletcher has interceded in this case without being requested or without appointment. [¶] And I think she's become personally and emotionally involved in this case, so I'm disqualifying her to represent this defendant." Fletcher again objected, reiterating that petitioner had no grounds for removing her and stating that "the Court's behavior has been inappropriate in this matter." Petitioner then stated: "Ms. Fletcher, you're getting close to contempt. And I would suggest that you sit down and be quiet." According to Fletcher, petitioner "was angry when this was going on, once [she indicated her intent to disqualify] him."

■ On this record, we agree with the Commission's unanimous finding that petitioner committed prejudicial misconduct in refusing to appoint Kimberly Fletcher while immediately appointing another public defender to represent Riegle. Petitioner raised a question regarding Fletcher's representation of Riegle only after she indicated her intent to disqualify him. His request for a qualification form for Riegle was contrary to his prior practice. He appointed a substitute public defender without inquiring or commenting further about Riegle's eligibility. These facts indicate that petitioner's purported concern about Fletcher's alleged failure to qualify Riegle for representation was merely a pretext for his decision to exclude Fletcher from the case because of her expressed intent to disqualify him. In so retaliating against Fletcher, petitioner committed prejudicial misconduct.[16] (See *In re Rasmussen* (1987) 43 Cal.3d 536, 538 [236 Cal.Rptr. 152, 734 P.2d 988] [judge committed misconduct in "displaying a lack of impartiality to, and petty harassment of attorneys who filed affidavits of prejudice against him," and in "discouraging the exercise of peremptory disqualification rights by inappropriate means"].)

(b) *Count Eleven C: Tippets Matter*

On September 14, 1993, Deborah Tippets appeared before petitioner on a charge of shoplifting four packages of developed film. Her attorney, Kimberly Fletcher, suggested a disposition of informal diversion. After some discussion of the facts of the case and Tippets's explanation, petitioner suggested "a one-year dispo and have her do some things." Fletcher indicated that the proposal was "acceptable." The district attorney then suggested payment of $150 in court costs as well. Tippets indicated she could not afford that amount. Petitioner responded: "Well, one minute you tell us you're wealthy and can pay for stuff, and the next minute, you say . . . you can't pay $150.00 fine." After Tippets explained that she had just moved, petitioner abruptly declared: "All right. Let's set it for trial, then." Tippets

---

[16]Because neither the special masters nor the Commission found that petitioner's comment about contempt constituted prejudicial misconduct, we do not consider the question.

and Fletcher then attempted to explain Tippets's financial situation. Petitioner seemed to ignore these comments, responding by simply asking: "When do you want to try it?"

After petitioner immediately repeated this question, Fletcher stated: "I'm going to have to [disqualify] you, your Honor. I think there's some animosity here." Fletcher later explained to the Commission that she based her action on her perception that petitioner "had gotten angered by [Tippets's] comments . . . that she couldn't even afford $150, and lost patience. [Fletcher] was concerned it would be difficult at this time for [petitioner] to be impartial, given the long conversation with [Tippets] at that point." Fletcher was also acting on "what [she] perceived [were petitioner's] feelings about single women with kids out of wedlock [and] interracial [children]."

Petitioner replied: "There's no animosity. I'm trying to settle the case." Fletcher started to reply, when petitioner interjected: "[I]f you don't want me to get involved in settling cases, then I won't. But you get me involved. And then as soon as I get involved in it, then you say, 'Oh, we're going to have to [disqualify] you' because I'm trying to encourage settlement." According to the court reporter's notation in the hearing transcript, petitioner was yelling at this point. The reporter testified before the special masters that her practice was to indicate in the transcript the demeanor of the person speaking—here that petitioner was yelling—"[w]hen it was so out of the ordinary." In his testimony, petitioner confirmed that he "probably" was yelling when he made this statement. Petitioner also testified that, in his view, he had been trying to help Fletcher persuade Tippets to take the plea offer, and that he was "shocked" that Fletcher "suddenly turned against" him by mentioning disqualification.

After petitioner and Fletcher discussed Tippets's comments regarding her ability to pay for the allegedly stolen film and her inability to pay the suggested fine, petitioner asked whether Tippets had made a statement to the store security guard. The district attorney replied she had told the security guard she put the film "under [a] blanket because [her] baby's bottle was leaking, and she didn't want the liquid on the photographs." As Tippets attempted to speak, petitioner interrupted and exclaimed: "Inconsistent. Inconsistent." Contrary to petitioner's exclamation, Tippets's statement to the security guard was consistent with the explanation she gave petitioner earlier in the hearing.[17] Fletcher apparently tried to explain this fact, and to suggest that petitioner's comment supported her concern that petitioner felt animosity toward Tippets.

---

[17]Tippets explained at the hearing that two of her children were "grabbing at the film and going through it," so she put it "next to the baby in between the infant carrier. . . And the

Nevertheless, petitioner continued: "I've been in this job for 35 years. I can tell when people have a little bit of shaky background as far as their position. And if . . . they're changing statements and changing reasons why they did something, then it gives you an indication that maybe there was an intent there." According to petitioner, he was expressing his view that neither he nor a jury would believe Tippets's explanation and that she would be convicted.

As Fletcher attempted to respond, petitioner continued: "But if you don't want me to get involved in trial settlements anymore, then I won't. [¶] But I try to settle cases to save taxpayers' money and to save her a possibility of going to jail and being convicted of a serious crime. [¶] But if you don't want me to do that, I won't do that anymore. [¶] I won't give you an indicated sentence. [¶] And you can just do your thing."

The transcript then shows the following exchange as petitioner and Fletcher argued with each other:

"Ms. FLETCHER: Well, I—

"THE COURT: (Yelling) but I'm getting sick and tired of you . . . threatening me with [disqualification]. [¶] And I'm not going to have it anymore.

"Ms. FLETCHER: Then, Your Honor, a simple solution would be not to make these prejudicial statements and—

"THE COURT: (Yelling) then don't get me involved in trial settlements.

"Ms. FLETCHER: —misstating her statements.

"THE COURT: (Yelling even louder) but if you ever threaten a judge in Fresno on a [disqualification], you'll be held in contempt. I guarantee you.

"Ms. FLETCHER: And I can guarantee you that threatening counsel because you have been [disqualified] will get you in trouble with Judicial Council. And that is not contempt.

"THE COURT: I haven't been—I haven't been [disqualified].

"Ms. FLETCHER: Well, all we have to do is read this record back. [¶] I just moved to do it.

---

liquid was leaking out of the [baby's] bottle onto the film. [¶] So [she] took the baby blanket and covered the film, but [she] didn't completely cover it."

"THE COURT: Fine. [¶] Oh, you just moved to disqualify me?

"MS. FLETCHER: Yes.

"THE COURT: Oh, okay.

"MS. FLETCHER: Let's set it for trial. And I'm moving—

"THE COURT: I can't set it for trial." Petitioner then set the case for trial before a different judge.

Petitioner denied that he was yelling during this exchange. However, the court reporter testified that he was speaking in a "[l]oud voice," was "rising up" or "raising forward," and was "very angry."

In his answer to the Commission charges, petitioner explained: "[I] admit[], in retrospect, that [I] was a little too pushy, probably because of [my] lack of confidence in Ms. Fletcher, in convicting [sic] her client that the offer was in her best interest. At the time there was not sufficient funds in the county there was a hiring freeze [sic], the court was short two clerks out of five authorized, and the need to save money was paramount at the time. With the trial date that week, it was imperative that we reach a settlement on the day in question."

 On this record, we agree with the Commission's conclusion (by a vote of nine to one) that petitioner committed prejudicial misconduct in his handling of the Tippets case. At the time of the Tippets matter, former California Code of Judicial Conduct, canon 3B(4), effective October 5, 1992, provided that "[a] judge should be patient, dignified, and courteous to litigants, jurors, witnesses, lawyers, and others with whom the judge deals in an official capacity . . . ." (See now Cal. Code Jud. Ethics, canon 3B(4), as adopted eff. Apr. 15, 1996 [currently imposing same duty].) Petitioner's conduct during the Tippets hearing fell far short of this standard, bringing the judicial office into disrepute. (See *Kloepfer, supra,* 49 Cal.3d at pp. 857-858; *In re Rasmussen, supra,* 43 Cal.3d at p. 538; *McCartney, supra,* 12 Cal.3d at pp. 531-532.)

In reaching this conclusion, we are not unmindful of Attorney Kimberly Fletcher's conduct. We also recognize that "[a] court has authority to control courtroom conduct of an attorney that is in flagrant disregard of elementary standards of proper conduct and to temper [counsel's] speech in order 'to insure that courts of law accomplish that for which they were created— dispensing justice in a reasonable, efficient and fair manner.' [Citation.]"

(*Hawk* v. *Superior Court* (1974) 42 Cal.App.3d 108, 123 [116 Cal.Rptr. 713].) Indeed, in 1993, during the Tippets matter, former California Code of Judicial Conduct, canon 3B(4), effective October 5, 1992, also directed a judge to "require" *lawyers* to be "patient, dignified, and courteous" in their courtroom behavior. (See now Cal. Code Jud. Ethics, canon 3B(4), as adopted eff. Apr. 15, 1996 [currently imposing same duty].) ▮ In performing this duty, " 'trial judges confronted with disruptive, contumacious, stubbornly defiant [attorneys] must be given sufficient discretion to meet the circumstances of each case.' " (*In re Buckley* (1973) 10 Cal.3d 237, 253-254, fn. 21 [110 Cal.Rptr. 121, 514 P.2d 1201, 68 A.L.R.2d 248].)

▮ However, the record here shows that petitioner responded angrily the very first time Fletcher, understandably concerned that petitioner had become impatient with Tippets, mentioned disqualification. He *immediately* began yelling at Fletcher about her use of the disqualification procedure. After expressing his view that Tippets's explanation was not credible, petitioner returned to the disqualification issue, again yelling at Fletcher that he was "sick and tired" of her disqualification threats and was "not going to have it anymore."[18] The situation then escalated, with Fletcher asserting that petitioner could avoid being disqualified by refraining from making prejudicial and inaccurate statements, petitioner yelling in reply that Fletcher should not get him involved in settlements and that another court would treat her disqualification threat as contempt, and Fletcher answering that threatening counsel in response to a disqualification motion would "get [petitioner] in trouble with Judicial Council." Although we do not condone Fletcher's conduct, viewing the incident in its entirety, we conclude that petitioner's behavior in response to the disqualification attempt constituted prejudicial misconduct. (See *Dodds, supra,* 12 Cal.4th at p. 176 [judge committed prejudicial misconduct by "interrupting and yelling loudly and angrily at counsel and a litigant"]; *Wenger, supra,* 29 Cal.3d at p. 629 [judge entitled to take remedial steps in response to counsel's intemperate language committed willful misconduct by misusing contempt power]; *Cannon* v. *Commission on Judicial Qualifications* (1975) 14 Cal.3d 678, 706 [122 Cal.Rptr. 778, 537 P.2d 898] [judge improperly used punitive action as first, rather than last, "means of controlling proceedings"].)

---

[18]The record does not support petitioner's perception that Fletcher often sought to disqualify him. According to Fletcher, the Tippets matter was only the second case in which she had sought to disqualify petitioner. The first case was the Riegle matter, which had occurred the previous month. The only other case was during late July or early August 1994, well after the Tippets matter. Thus, between 1990, when she became a public defender, and August 1994, when she left the position, she sought to disqualify petitioner only three times. The district attorney confirmed that Fletcher did not frequently seek to disqualify petitioner.

10. *Count Twelve: Inappropriate Handling of the Toschi Matter*

In January 1989, the Madera County District Attorney charged Michael Toschi with the misdemeanors of driving under the influence of alcohol and driving with an excessive blood-alcohol concentration and alleged that he had suffered one prior conviction for the former offense. On May 10, as part of a plea bargain involving a separate felony charge of assault with a deadly weapon, the district attorney moved to dismiss the drunk driving case. The original plea bargain did not expressly encompass the drunk driving charges because counsel were unaware of them when they reached the bargain. The district attorney sought dismissal after concluding that the plea bargain would have included these charges had counsel known of them.

Petitioner, who was then assigned to the Madera Justice Court, denied the motion, stating "that the state Department of Motor Vehicles desired certain actions be taken against" Toschi. Toschi's counsel interpreted petitioner's comments as a statement of his own desires and an indication that he had already concluded Toschi was guilty. After denying the motion, petitioner ordered the district attorney to file an amended complaint adding a second alleged prior drunk driving conviction. The district attorney complied with petitioner's order on May 16, 1989.

During pretrial proceedings on May 17, the district attorney informed petitioner that he was "going to move the Court to strike the amended complaint and make a motion to dismiss." Without waiting for the motion to be made and without argument, petitioner immediately responded: "Motion denied." The district attorney then asked whether petitioner had "any knowledge of the facts in this case." Petitioner replied that he did not, but that he knew from "the printout" that Toschi had two prior convictions. Petitioner then explained that, despite his lack of knowledge about the facts of the case, he was denying the dismissal motion because he thought "in the interest of justice, a man with a drunk driving and two priors should go to trial." The district attorney responded that petitioner could not know Toschi "was a drunk driver unless [petitioner] ha[d] knowledge of the facts of the case," and that petitioner was not required to assume the truth of the complaint without such knowledge. Regarding the latter statement, petitioner replied: "All right. Well, the Court does."

Petitioner and the district attorney continued to argue about whether it was proper for petitioner to deny the dismissal motion without knowledge of the facts of the case. Petitioner then explained his understanding that the district attorney's motion was "[b]ased on a plea bargain, not based on the evidence," and that the plea bargain was an inadequate basis for dismissing the case, given the danger that a recidivist drunk driver posed to the community.

Unsatisfied with petitioner's explanation, the district attorney "de-mand[ed] immediate trial" and "ask[ed] [petitioner] to disqualify [him]self on the grounds that [he] ha[d] . . . apparent knowledge of the facts in this case." The district attorney asserted that, given petitioner's "apparent knowl-edge of the facts in this case, [he] would be prejudiced." Petitioner denied the motion and set the case for trial before him.

After the hearing, and without the request or knowledge of either party, petitioner ordered the court clerk to review the police reports in the case file and issue subpoenas to all witnesses. According to petitioner, he took this action because the district attorney had said he would not subpoena the witnesses. At the time, petitioner believed he "had authority to order wit-nesses where the District Attorney was going to not act in his official capacity to do that."

At petitioner's direction, the clerk later spoke by telephone directly with a subpoenaed witness from the police department and determined that the witness was not available for the scheduled trial date. Petitioner then con-tacted defense counsel, informed her of this problem, and asked her to agree to a continuance. Counsel refused and later corrected petitioner when he indicated that she had agreed to the continuance.

Based on these contacts "and some information that [petitioner] ha[d] also talked to some other potential witnesses in the case," counsel concluded that petitioner "himself [was] desirous of trying the case . . . ." Counsel felt that petitioner "had overstepped [his] bounds" and "become a prosecutor instead of an impartial magistrate, and that [Toschi] wasn't going to get a fair trial." On May 31, counsel therefore made a formal motion to disqualify petitioner, asserting that his actions and his statements during the prior hearing showed that he had prejudged the case. Over petitioner's opposition, the motion was granted.

Throughout the Commission's disciplinary proceedings, petitioner main-tained that his actions in the Toschi matter resulted from his personal concerns about the district attorney, Paul Avent. Avent had unsuccessfully run against petitioner in a 1988 judicial election and, according to petitioner, was "very bitter" about the election, had "accused [petitioner] of stealing his votes and cheating to get his judges [sic] job," and had "expressed that he would never forgive [petitioner] for stealing his job." Petitioner believed that Avent had tried to "pull[] things" in the courts of other judges he had unsuccessfully opposed and "then reported them in the paper."

According to petitioner, he "was warned . . . by [his] bailiff [that Avent was] going to try to pull something on [petitioner], to get [petitioner] in

trouble . . . ." When Avent appeared in the Toschi matter, petitioner "realized for the first time that this was the case that Mr. Avent was going to pull something." Petitioner explained: "I thought that I outwitted [Avent] by telling him that the motion was decided and not in the interest of justice and . . . Mothers Against Drunk Drivers [*sic*] was pretty heavy. All the publicity going on. I could see my name in the paper, 'Judge Fletcher dismisses drunk driving with two priors without cause.' [¶] So I denied the motion, and Mr. Avent challenged me in court that he could go ahead and set the jury trial. He wasn't going to call any witnesses. I had two options. I had an option to recuse him and appoint the attorney general to . . . prosecute Mr. Toschi, which would [have] disqualified me from sitting in Madera from then on, because the Madera D.A.'s office do [*sic*] not take those things lightly and have blanketed other judges that stand up to him. [¶] And I felt the only option I had was to bluff him into thinking that the court was going to subpoena witnesses."

Before the special masters, petitioner conceded that, having ordered the district attorney to allege additional charges and the clerk to subpoena witnesses, he "probably should have" disqualified himself. Similarly, in his answer to the Commission, petitioner stated: "In hind sight [*sic*] and now with six years of experience, I only had 5 month [*sic*] at the time, I would have disqualified myself for the Jury trial. Even though I was not prejudiced or bias [*sic*], or knew anything about the case, it might have had the appearance that I was in some was [*sic*] bias [*sic*]. It is easy to see that now, back then I was bound and determine [*sic*] to prove that I was not bias [*sic*] . . . ."

On this record, we agree with the Commission's unanimous conclusion that petitioner committed willful misconduct in handling the Toschi matter. We reached a similar conclusion on analogous facts in *Ryan* v. *Commission on Judicial Performance* (1988) 45 Cal.3d 518 [247 Cal.Rptr. 378, 754 P.2d 724, 76 A.L.R.4th 951]. There, after learning that the district attorney intended to prosecute a sodomy charge as a misdemeanor, the judge contacted the district attorney ex parte and urged him to pursue the matter as a felony. (*Id.* at p. 535.) Although the judge's action did not prejudice the defendant (because the district attorney did not follow the suggestion), we nevertheless found that the judge committed willful misconduct. We explained: "Judge Ryan attempted to intrude into the charging authority of the administrative branch of government. Moreover, he deprived the defendant of an impartial magistrate by advocating a harsher charge." (*Ibid.*) Here, petitioner also attempted to intrude on the district attorney's authority, but not by simply suggesting a course of action; petitioner, by having his clerk review the file and subpoena all prosecution witnesses, took it upon himself

to do the district attorney's job. He thus deprived Toschi of an impartial judge.

Indeed, as petitioner conceded during the special masters' hearing, he "probably should have" disqualified himself as a result of his actions. Petitioner's order that the witnesses be subpoenaed was "particularly destructive of the image of the court as an impartial forum for the determination of truth." (*McCartney, supra,* 12 Cal.3d at p. 533.) ▉ As we recently explained in *Broadman,* "there is a compelling public interest in maintaining a judicial system that both is in fact and is publicly perceived as being fair, impartial, and efficient." (*Broadman, supra,* 18 Cal.4th at p. 1103.) Thus, "[j]udges . . . cannot be advocates for the interests of any parties; they must be, and be perceived to be, neutral arbiters of both fact and law [citation] who apply the law uniformly and consistently." (*Id.* at p. 1100.) ▉ Petitioner's action in directing the clerk to subpoena witnesses "create[d] the public impression that [he] ha[d] abandoned the judicial role to become an advocate for [his] own ruling" in denying the prosecution's motion to dismiss the charges against Toschi. (*Id.* at p. 1101; see also *Wenger, supra,* 29 Cal.3d at p. 632 [judge who "inject[ed] himself into a proceeding" by undertaking a collateral investigation without consulting the parties committed prejudicial misconduct].)

Moreover, petitioner took this action because of a personal conflict with a political rival. According to petitioner, he considered "two options" to address his concern that Avent was trying to damage him politically: "recuse [Avent] and appoint the attorney general to . . . prosecute Mr. Toschi," or "bluff [Avent] into thinking that the court was going to subpoena witnesses." Petitioner chose the latter option because of his concern that the former would result in his own disqualification in all future proceedings involving the Madera District Attorney. In choosing the latter option for personal reasons and, as the Commission found, to "[b]luff[] and battl[e] with political opponents," petitioner committed a judicial act for a purpose other than the faithful discharge of his judicial duties. (See *In re Rasmussen, supra,* 43 Cal.3d at p. 538 [misconduct to initiate probation revocation proceedings for "personal reasons other than the faithful discharge of [judicial] duties"]; *Wenger, supra,* 29 Cal.3d at p. 652 [judge committed willful misconduct in taking judicial action motivated by personal animosity].) He thus committed willful misconduct.[19]

11. *Count Thirteen B: Investigation of Larry Bjorklund*

In 1989, petitioner joined a church at which Larry Bjorklund was pastor. Between that time and May 1992, when he became inactive in the church,

---

[19]Given our conclusion, we need not consider the parties' arguments as to whether petitioner had statutory authority to order the clerk to subpoena the witnesses.

petitioner, who was a church elder, and Pastor Bjorklund had a number of disputes. According to Pastor Bjorklund, petitioner was very critical of his preaching, his doctrinal approach, and his general performance as a pastor. Based on petitioner's perception of the pastor's personal problems, petitioner doubted Pastor Bjorklund's pastoral abilities. At a church meeting in early 1992, petitioner accused Pastor Bjorklund of giving a heretical and blasphemous sermon and impliedly accused him of having an extramarital affair. Petitioner became inactive at the church a short time later.

According to petitioner, at some point during this period, Detective Sergeant Milt Gauthier of the Madera Sheriff's Office came to petitioner's chambers to discuss a child molestation investigation involving a member of petitioner's church. Gauthier wanted to learn what petitioner knew about the alleged victim's father. During the conversation, Gauthier stated that the pastor had counseled and interviewed the alleged victim for 15 to 20 hours, trying to get her to admit that her father had molested her. In response, petitioner told Gauthier that he "had some real concerns about [the pastor's] methods in trying to . . . prove a case against [the alleged victim's father], because [the pastor] was upset at" the alleged victim's father.

Petitioner, who was a church elder at the time, also voiced concern about the church's potential civil liability for permitting the pastor to provide counseling if he were not licensed. According to petitioner, Gauthier also expressed interest in determining the pastor's licensing status, suggesting that counseling without a license might be a misdemeanor under a county ordinance. Petitioner then stated: "Well, you know, don't do it for me. If you run across any information whether he's licensed or not, I'd like to know. I want to advise the church Board if we have a risk going on." When Gauthier replied that he intended to call the "State Board of Licensing," petitioner replied: "That's up to you. . . . I'd appreciate knowing what you find out." A short time later, Gauthier delivered a written summary of his investigation to petitioner, which indicated that the pastor was not licensed, that he had not had a license revoked, and that he probably did not need to be licensed.

Other than petitioner's testimony, the only evidence before the Commission regarding this incident came from a deposition the pastor gave pursuant to a stipulation and order of the presiding special master. The deposition was ordered in anticipation of the pastor's unavailability for trial. On direct examination, and without objection by petitioner, the pastor testified that he received a call after petitioner had left the church from someone named Gene, who informed him that petitioner "had ordered an investigation into [the pastor's] credentials as a pastoral counselor." After the pastor called the sheriff's office to investigate the information, he received a visit from

Gauthier, who "told [him] that [petitioner] had . . . asked [Gauthier] to do an investigation to find out about [the pastor's] qualifications as being a pastoral counselor," and that petitioner "had some concern about the church maybe being legally . . . liable." Prompted by petitioner's questions on cross-examination, the pastor testified that Gene Zimmerman, who was with the Madera Employees Union, had first contacted him about the "alleged investigation." The pastor also reiterated on cross-examination, again without objection, that Gauthier had "explain[ed] the circumstances under which he felt obligated to perform th[e] investigation, but he had been directed by [petitioner]." Petitioner then asked, "Is that what he told you?" The pastor replied: "That's the word. That's what he told me."

On this record, the special masters found that, by asking Gauthier "to share information gathered during the course of his investigation, [petitioner] was using the prestige of his office for a personal purpose." They concluded: "Although, this incident does not constitute the 'instigation' of any criminal investigation for a personal purpose, it nevertheless constitutes willful misconduct." The Commission found that petitioner had "prevailed upon Sergeant Gauthier to inquire and advise [him] regarding the license status of Pastor Bjorklund for reasons that were entirely personal and unrelated to Sergeant Gauthier's investigation" of the molestation case. Finding that Gauthier had acted "because [petitioner] invoked his authority as a judge to request the report," and not "out of friendship" or "as a favor," the Commission unanimously concluded that petitioner "abused the judicial power and committed willful misconduct in office" by "ask[ing] Sgt. Gauthier to conduct an investigation of his rival for a personal purpose."

Petitioner contends that there is no *competent* evidence to support the finding that he asked Gauthier to investigate the pastor. He argues that the pastor lacked personal knowledge regarding petitioner's role in the inquiry, that the pastor's deposition testimony on this subject is inadmissible hearsay, and that we should not consider it despite his failure to object during the Commission proceedings.

■■■ We do not reach the merits of petitioner's evidentiary objection because, even crediting the pastor's testimony, we find the evidence insufficient to support the Commission's willful misconduct conclusion. Even if we assume that petitioner asked Gauthier to investigate the pastor, we find that petitioner was not acting in a judicial capacity when he did so. "First, petitioner was not performing one of the functions generally associated with his position as a judge. [Citations.]" (*Dodds, supra,* 12 Cal.4th at p. 175.) "Second, though petitioner was [in his chambers] when he met with [Gauthier], that location was simply a convenient meeting place that

[Gauthier] selected. The meeting had nothing to do with petitioner's work as a judge, but rather his status as [someone who knew individuals involved in the matter] that [Gauthier] was investigating. [Citation.]" (*Ibid.*) Finally, there is no evidence that petitioner "attempt[ed] to curry favor with [Gauthier] . . . on account of his judicial status. [Citation.]" (*Id.* at p. 176.)

Nor does the pastor's deposition testimony that Gauthier "felt obligated to perform th[e] investigation" constitute clear and convincing evidence that petitioner "use[d], or attempt[ed] to use, his authority as a judge for improper ends . . . ." (*Dodds, supra,* 12 Cal.4th at p. 172.) "To hold that petitioner acted in a judicial capacity simply because his [request] carried with it a degree of authority due to his status as a judge . . . would mean that a judge is always acting in a judicial capacity when he [or she] talks to [law enforcement personnel]. We decline to interpret 'judicial capacity' so broadly." (*Id.* at p. 175.)

Nor, on the totality of the circumstances in this case, do we find clear and convincing evidence that petitioner committed prejudicial misconduct. The record does not indicate that petitioner attempted to pressure Gauthier into investigating the pastor. In the context of a conversation that Gauthier initiated by coming to petitioner's chambers and seeking his help in the molestation investigation, and given Gauthier's expressed concern about the pastor's counseling of the alleged victim, petitioner's request (assuming he made it) that Gauthier determine the pastor's licensing status does not constitute prejudicial misconduct. As a church elder, petitioner was legitimately concerned about the pastor's conduct and his qualifications. Although judges must be careful not to take advantage of their position, petitioner's position as a judge did not disable him from making a request of the sheriff's office that any other member of the community with similar concerns could make.

Moreover, having independently reviewed the evidentiary record, and even considering the pastor's testimony, we do not find clear and convincing evidence to support the Commission's conclusion that petitioner "asked Sgt. Gauthier to conduct an investigation of" the pastor. ▮ Even unchallenged hearsay statements "should be evaluated . . . for what they are worth." (*San Bernardino Valley Water Dev. Co.* v. *San Bernardino Valley Mun. Water Dist.* (1965) 236 Cal.App.2d 238, 266 [45 Cal.Rptr. 793].) They should " 'be weighed by the trier of facts the same as other evidence and may be disregarded where shown to be unconvincing or insubstantial. [Citation.]' " (*Estate of Moore* (1956) 143 Cal.App.2d 64, 74 [300 P.2d 110].) ▮ Here, there are good reasons to question the pastor's hearsay testimony. The record shows that both the pastor and Gauthier could be considered petitioner's opponents. The Commission's findings support this

conclusion, describing petitioner's relationship with the pastor and with Gauthier as, respectively, "hostile and strained" and "not one of mutual friendship and trust." Notably, unlike the Commission, the special masters did *not* find that petitioner *initiated* the investigation, but found only that he "asked Sgt. Gauthier to advise him if he discovered during the course of his investigation that [the pastor] was not a licensed counselor" and "to share information gathered during the course of his investigation." ▮ On review, we accord special weight to the factual findings of the special masters, not of the Commission. ▮ Given the special masters' finding and petitioner's direct testimony on the matter, even considering the pastor's testimony, we do not find clear and convincing evidence that petitioner directed Gauthier to investigate the pastor or committed prejudicial misconduct in asking Gauthier to share the results of his inquiry.[20]

Because we find insufficient evidence of willful or prejudicial misconduct, we dismiss the charge contained in count thirteen B of the second amended notice of formal proceedings.[21]

### 12. *Count Sixteen: Improper Conduct in the Rivas Matter*

Petitioner, sitting as a visiting judge in the Madera Justice Court of Madera County, was assigned to preside in a criminal case against Lisa Rivas. On April 3, 1990, the district attorney filed a peremptory challenge against petitioner under Code of Civil Procedure section 170.6. Petitioner called the Rivas case the next day, noting that the hearing was "just a motion to disqualify." When petitioner asked about the March 30 preliminary hearing, the district attorney started to respond, and then stated: "No offense—People filed a [Code of Civil Procedure section] 170.6 motion, so I

---

[20]Petitioner's conduct was significantly different from the conduct we found improper in *Broadman*. There, motivated by personal animosity, Judge Broadman made a concerted effort "to affect the outcome in [a] legal malpractice case" against Attorney Arthur Kralowec. (*Broadman, supra*, 18 Cal.4th at p. 1106.) Judge Broadman *twice* summoned to his chambers plaintiff's attorney in the malpractice case and offered assistance in strengthening plaintiff's case; initiated (without request) discovery efforts on plaintiff's behalf; and appeared in the courtroom during trial of the malpractice case " 'just [to be] an asshole.' " (*Ibid.*) Here, by contrast, Gauthier sought out petitioner and solicited his knowledge of the parties involved in the ongoing criminal investigation, including the pastor. Moreover, Gauthier prompted petitioner's comments about the pastor's licensing status by remarking that the pastor had spent 15 to 20 hours trying to get the alleged victim to admit that her father had molested her. Petitioner simply did not engage in the kind of intentional interference that we found to be prejudicial misconduct in *Broadman*.

[21]Given our conclusion, we deny petitioner's request that we consider and take judicial notice of additional documentary evidence attached to his petition. The additional evidence purports to be an interview transcript in which Gauthier gave an account of the incident that differs substantially from petitioner's. We deny the request for the additional reason that, as petitioner explains, the transcript was "supplied by the Commission counsel during discovery." Petitioner offers no explanation for his failure to introduce the evidence during the Commission proceedings.

don't think the Court should inquire into what happened on the 30th. [¶] People are prepared to let this Court set some new dates closer to today's date to help [defense counsel] and his client and for that limited purpose only." When petitioner again asked about the prior hearing, the district attorney stated that the inquiry was "inappropriate," given the disqualification motion. Petitioner then stated, without any input from defense counsel: "Well, first we have got to find out whether the defendant's constitutional rights and statutory rights were violated with respect to a speedy preliminary hearing before you can get to any issues." In response to the district attorney's continued objection, petitioner stated, "I don't think you can use [Code of Civil Procedure section] 170.6 to violate constitutional rights," and "I want to make that determination before I proceed."

Over the district attorney's objection, petitioner then considered the speedy hearing question. Defense counsel asserted that Rivas had not waived her right to a speedy preliminary hearing. The district attorney, while continuing to object, asserted that Rivas had waived time so that the court could hear certain defense motions. When the district attorney asserted that petitioner lacked jurisdiction to determine whether Rivas had waived time, petitioner replied, "You're wrong," and explained, "You cannot file a [Code of Civil Procedure section] 170.6 [motion] and violate somebody's constitutional rights or statutory rights." Petitioner then directed the court reporter to get her notes from the preliminary hearing. Because the reporter's notes were not readily accessible, petitioner continued the hearing to April 6. He explained that "[t]he only issue" he would consider at the continued hearing was whether Rivas had waived time, explaining, "I can't hear [the case] for any other purposes."

On April 6, the district attorney sought and obtained an alternative writ of mandate and prohibition ordering petitioner to accept the peremptory challenge in the Rivas matter or to show cause for not doing so, and prohibiting him "from presiding in [the] case until further order of [the issuing] court." The district attorney served the writ on petitioner. At defense counsel's request, petitioner called the Rivas matter later that day. At the start of the hearing, petitioner acknowledged that he was "in possession of" the writ.[22] Responding to a question about his intent in light of the writ, petitioner explained: "I cannot hear this case for any other purpose than to determine whether [Rivas's] ten-day in custody right to a prelim[inary hearing] had been violated, and take judicial notice if that has been violated . . . [¶] . . .

---

[22]The district attorney testified that he personally served petitioner with the signed writ in chambers before the April 6 hearing in the Rivas case. Given this testimony, and the transcript of the April 6 hearing, during which petitioner acknowledged that he was "in possession of" the writ, we reject petitioner's challenge to the adequacy of the evidence that he received the writ before the April 6 hearing.

based on the record, the court records. I can't hear any contested issue of fact or law."

The district attorney disagreed with petitioner, insisting that he could take no action in the case of any kind, including considering the speedy hearing question. In response, defense counsel urged petitioner to determine the speedy hearing issue, arguing that it did not involve the merits of the case and that the constitutional right to be free from illegal detention outweighed the prosecution's statutory right to disqualify. Petitioner replied to defense counsel: "I think the defense ought to file a writ with the superior court that granted this writ, advising that court that your client's constitutional rights or statutory rights at least are being violated by keeping her in custody past her ten-day limit without her waiver, and without finding a good cause by the magistrate that continued the case. I think that's your remedy."

After a comment from defense counsel, petitioner continued: "It just shocks me that this can happen, that people that are supposed to be protectors of the peoples' rights, protecting of property, protecting of everything that we stand for, are playing games this way. It's just shocking to me." Petitioner continued: "I feel very strongly I don't want anything to do with this court again in Madera, and I'm going to take action to try to keep myself from even coming down here anymore. That's how strongly I feel about it. It's shocking to be associated with officers of the court, people who have pledged to uphold the law and support the Constitution, take this kind of action. It just shocks me beyond belief. Makes me embarrassed to even be associated with such people. [¶] Anyway, that's your remedy, I think . . . ." Finally, after defense counsel insisted that Rivas was being remanded to custody "without any redress of her grievances," petitioner commented, "Seems to me she has some legal remedies." Petitioner took no further action in the case.

 On this record, we agree with the Commission's unanimous conclusion that petitioner committed prejudicial misconduct in his handling of the Rivas matter, but not for all of the reasons that the Commission cited.

The Commission concluded that petitioner committed prejudicial misconduct by "fail[ing] to transfer the *Rivas* case after the filing of the [peremptory challenge] and [deciding] to continue the case to his own calendar." However, we agree with the special masters that petitioner's initial decision to consider the speedy hearing question despite the peremptory challenge at most constituted a legal error. Although Code of Civil Procedure section 170.6 prohibits a properly challenged judge from "hear[ing] any matter . . . which involves a contested issue of law or fact," as the Commission notes, under Code of Civil Procedure section 170.4, subdivision (a)(1), a disqualified judge may "[t]ake any action or issue any order necessary to maintain

the jurisdiction of the court pending the assignment of a judge not disqualified." Under Penal Code section 859b, "[w]henever [a] [criminal] defendant is in custody," and absent a waiver or good cause, the court "shall dismiss the complaint if the preliminary examination is set or continued beyond 10 court days from the time of the arraignment, . . . and the defendant has remained in custody for 10 or more court days solely on that complaint . . . ." Petitioner's belief that, notwithstanding the peremptory challenge, he could determine the speedy hearing question to preserve the court's jurisdiction "had at least enough merit to prevent the holding of it from constituting misconduct." (*Wenger, supra,* 29 Cal.3d at p. 647, fn. 13.) ▮ "[A] judge should not be disciplined for mere erroneous determination of legal issues, including questions of limitations on the judicial power, that are subject to reasonable differences of opinion. [Citation.]" (*Gubler* v. *Commission on Judicial Performance* (1984) 37 Cal.3d 27, 47-48 [207 Cal.Rptr. 171, 688 P.2d 551].)

▮ Nor on this record do we find that petitioner committed prejudicial misconduct in resuming the hearing on April 6 despite issuance of the writ or in suggesting that Rivas's remedy was to petition for a writ. On April 4, petitioner had continued the case to April 6, and called the case on that date only at the request of defense counsel. Defense counsel and the prosecutor then argued about whether petitioner could consider the speedy hearing issue despite issuance of the writ. Defense counsel insisted that petitioner could proceed because Rivas's constitutional rights outweighed the prosecution's statutory right of disqualification and the illegal detention issue did not present a factual issue or touch on the merits of the case. Only then did petitioner, concluding that he could not proceed, suggest that Rivas file a writ, stating: "I think that's your remedy." We conclude that these actions did not constitute prejudicial misconduct.[23]

Nevertheless, we agree with the Commission that petitioner's comments at the end of the April 6 hearing constituted prejudicial misconduct. As we have noted, petitioner expressed "shock[]" and "embarrass[ment]" about the conduct of the "officers of the court," and accused them of "playing games" notwithstanding their pledge to uphold the law, support the Constitution, and protect "the peoples' rights." Petitioner also proclaimed that he did not "want anything to do with this court again in Madera." We agree with the Commission that petitioner committed prejudicial misconduct in responding to his peremptory disqualification by publicly criticizing the prosecutors and the Madera court on the record. (See *Kloepfer, supra,* 49 Cal.3d at p. 842 [inappropriate remarks about counsel]; *In re Rasmussen, supra,* 43 Cal.3d at

---

[23]Given our conclusion, we need not address petitioner's arguments regarding the adequacy of the writ.

p. 538 [basing misconduct finding on "intemperate, open-court criticism of a fellow judge"]; *Gonzalez, supra*, 33 Cal.3d at p. 371 [judge committed misconduct by making "insulting and derogatory comments from the bench and in his chambers impugning the character and competence of his judicial colleagues"].)

## IV. DISCIPLINE

■ "In making our independent determination of the appropriate disciplinary sanction, we consider the purpose of a Commission disciplinary proceeding—which is not punishment, but rather the protection of the public, the enforcement of rigorous standards of judicial conduct, and the maintenance of public confidence in the integrity and independence of the judicial system. [Citations.]" (*Adams, supra*, 10 Cal.4th at p. 912.) Our task "is to determine the nature of the discipline, if any, that is necessary to achieve these goals." (*Kloepfer, supra*, 49 Cal.3d at p. 865.)

Seven members of the Commission recommended petitioner's removal from office. The three remaining members voted against removal, and for severe public censure. As we have explained, petitioner concedes that he committed numerous acts of prejudicial misconduct. He also concedes that "his actions call for severe censure . . . ." However, like the minority of the Commission members, he urges that public censure is the appropriate sanction.

■ After independent consideration, we agree with the majority of the Commission members that petitioner's removal from office is necessary to protect the public and the judicial system. "The number of wrongful acts is relevant to determining whether they were merely isolated occurrences or, instead, part of a course of conduct establishing 'lack of temperament and ability to perform judicial functions in an even-handed manner.' [Citation.]" (*Wenger, supra*, 29 Cal.3d at p. 653.) We have determined that petitioner twice committed willful misconduct and committed prejudicial misconduct on multiple occasions. "Together these incidents reflect a continuing, pervasive pattern of" misconduct. (*Kloepfer, supra*, 49 Cal.3d at p. 849.) "Petitioner's lack of judicial temperament is manifest."[24] (*Kloepfer, supra*, at p. 866.)

---

[24]In concluding that removal is unwarranted in this case, the dissent asserts that petitioner's conduct is less egregious and offensive than that before us in *Broadman*, where we imposed public censure. (Dis. opn. of Kennard, J., *post*, at p. 923.) However, *Broadman* involved only three isolated acts of misconduct. (*Broadman, supra*, 18 Cal.4th at p. 1112.) By contrast, this case involves a continuing and pervasive pattern of misconduct. Where the record shows such a pattern of misconduct, "comparison of the discipline imposed in other cases . . . is not fruitful." (*Kloepfer, supra*, 49 Cal.3d at p. 867; see also *Broadman, supra*, 18 Cal.4th at p. 1112 ["Proportionality review based on discipline imposed in other cases . . . is neither

Petitioner blames much of his misconduct on inexperience and asserts that he has learned from his mistakes. He argues that "[t]he lack of available judicial education courses for justice court judges from 1988 to 1991, and the massive caseload facing a lone rural municipal court judge from 1988 through 1994, left [him] with limited access to judicial education and training material." He further asserts that "virtually all" of the instances of misconduct "were directly related" to this alleged "lack of available training" and "massive workload."

We find petitioner's arguments unpersuasive. The incidents of misconduct occurred between 1989 and 1994, during virtually petitioner's entire term in office before the Commission filed formal charges in early 1995. (See *Kloepfer, supra,* 49 Cal.3d at p. 866 [noting that misconduct incidents "occurred over the full span of petitioner's judicial career"].) Moreover, petitioner's 11 years as a deputy district attorney before he became a judge "should have acquainted him with criminal procedures. . . . His abuses in the civil matters . . . [are] too serious to be explainable by inexperience." (*Wenger, supra,* 29 Cal.3d at p. 654.) "In any event, lack of prior experience simply cannot mitigate wilful misconduct: if petitioner did not have the legal background and temperament to avoid committing malfeasance in office, he should not have sought election to the court." (*Furey* v. *Commission on Judicial Performance* (1987) 43 Cal.3d 1297, 1320 [240 Cal.Rptr. 859, 743 P.2d 919].)

Moreover, contrary to the contrite tone he sounds in this court, petitioner's primary response to the misconduct allegations during the Commission proceedings was to allege a conspiracy against him. During closing argument before the Commission, petitioner stated: "I just want to point out to the Commission that just about most of the witnesses that gave damaging testimony against me were all bias [*sic*]. They were all in concert together.

required nor determinative."].) The dissent also maintains that the record reflects nothing more than a judge in a small community who sometimes has had difficulty separating his judicial role from his role in the community. (Dis. opn. of Kennard, J., *post,* at p. 922.) Although petitioner's membership in a relatively small community arguably relates to his apparent inability to refrain from ex parte contacts, it should not excuse this misconduct. Nor does it have any bearing on petitioner's willful misconduct in altering minute orders to mislead the Commission and becoming an advocate against a criminal defendant because of his political rivalry with the prosecutor, or on his prejudicial misconduct in making improper comments about counsel, using court staff for campaign purposes, abusing his contempt powers, reacting inappropriately to disqualification attempts, prejudging cases, and publicly criticizing public officers. Finally, the dissent's view that the record lacks any hint that petitioner is corrupt, venal, or biased (dis. opn. of Kennard, J., *post,* at p. 922) does not require a different result. "Honesty" is one of the "minimum qualifications which are expected of every judge." (*Kloepfer, supra,* 49 Cal.3d at p. 865; see also *Wenger, supra,* 29 Cal.3d at p. 653 [ordering removal despite lack of evidence that judge used his office for illicit gain or neglected his work].)

They had meetings. They associate with each other. They had all one intent and purpose, to get me removed from the bench." After attacking the credibility and motives of specific witnesses (referring to one as "the main instigator behind a lot of these things"), petitioner commented: "I think there was a lot of shocking—to me, the bias, the false testimony that I observed in that hearing, it devastated me, put me back into the care of my doctor under stress and tension and depression." Petitioner closed by attacking his head clerk, asserting: "She was a heavy supporter of a person that opposed me in the election and she was very vindictive . . . . She gave information out to everyone that we discussed in confidence. She told other clerks or people down the hall, and I started out thinking that I was going to be accepted as a judge in that community, but I didn't realize the power of the people that resented me to be there and really did not want to cooperate with me."

Petitioner made similar comments during opening argument before the special masters, asserting that the Commission's evidence came from "biased witnesses" and that its witness list "is mainly people who have decided that they had some ax to grind against me . . . ." He insisted that "a lot of this is generated out of retaliation for [his] firing a clerk . . . ." He further asserted: "So we have a lot of biased people that have their own agenda why they want to get me or hurt me or in some way attack me . . . ." Petitioner repeated this theme in his testimony before the special masters. For example, regarding alteration of the minute orders in the Henderson matter, petitioner suggested that his clerk was "involved with a group of people that were sending everything they could find on [him] to the Commission" and that she had altered one of the orders "to make it look [to the Commission] like [he] was falsifying documents."

We agree with the Commission that petitioner's conspiracy claims are reminiscent of those we considered in *Gonzalez*. There, in imposing a removal sanction, we commented: "In the final analysis Judge Gonzalez utterly fails to grasp either the substance or seriousness of the numerous charges levelled against him by the Commission. Despite multiple admonitions and the normal evidentiary limitations of the hearing process, Judge Gonzalez has treated this investigation as an attack on his character. . . . He persists in his theory that his adversaries conspired to record his every misdeed and regards virtually every allegation as personally motivated. Rather than respond affirmatively and convincingly to the specific charges, he expend[ed] most of his defense effort in attacking the character and credibility of the adverse witnesses. While he concedes there may be certain minor irregularities in his judicial manner and procedures, he denies he has ever deliberately abused his judicial office and generally refuses to admit he has done anything improper." (*Gonzalez, supra*, 33 Cal.3d at p. 377.)

In summary, the record "belies petitioner's claim that he has learned from past experience and has modified his courtroom behavior. It demonstrates

instead an inability to appreciate the importance of, and conform to, the standards of judicial conduct that are essential if justice is to be meted out in *every* case." (*Kloepfer, supra,* 49 Cal.3d at p. 866, fn. omitted, original italics.) It "does not suggest that petitioner has, or will be able to, overcome [his demonstrated lack of judicial temperament] and that similar incidents will not recur." (*Ibid.*) "Mere censure of petitioner would woefully fail to convey our utter reproval of any judge who allows malice or other improper personal motivations to infect the administration of justice." (*Spruance, supra,* 13 Cal.3d at p. 802.) Thus, like the Commission, we conclude that petitioner's removal from office is necessary to protect the public and the judiciary's reputation.[25]

## V. DISPOSITION

We order that Judge Thomas B. Fletcher, judge of the Madera Superior Court, be removed from office. He shall, however, if otherwise qualified, be permitted to resume the practice of law (Cal. Const., art. VI, § 18, subd. (d)) on condition that he pass the Professional Responsibility Examination. This order is effective upon the finality of this decision in this court.

**KENNARD, J.,** Dissenting.—The majority finds that petitioner, Judge Thomas B. Fletcher, committed two instances of willful misconduct and a number of instances of conduct prejudicial to the administration of justice. It concludes that he should be removed from office. I disagree with the majority's conclusion that removal is the proper sanction for Judge Fletcher's misconduct, as well as with one of its findings of willful misconduct. None of Judge Fletcher's acts of misconduct involved corruption or moral turpitude, and he has sought to reform his conduct. Removal is not necessary to protect the public and the judiciary. Instead, in my view, public censure is the appropriate sanction in this case.

## I

As we recently explained, willful misconduct requires a finding by clear and convincing evidence that the judge acted in bad faith. "A judge acts in bad faith only by (1) performing a judicial act for a corrupt purpose (which is any purpose other than the faithful discharge of judicial duties), or (2) performing a judicial act with knowledge that the act is beyond the judge's lawful judicial power, or (3) performing a judicial act that exceeds the

---

[25]The dissent asserts that removal is inappropriate in part because petitioner has expressed remorse and resolved to do better. (Dis. opn. of Kennard, J., *post,* at p. 923.) However, as our discussion demonstrates, "[t]he difficulty with [petitioner's] professed enlightenment is its delayed arrival." (*Wenger, supra,* 29 Cal.3d at p. 654.) "Mitigation of wrongdoing requires more than an unfulfilled intent to reform." (*Ibid.*)

judge's lawful power with a conscious disregard for the limits of the judge's authority." (*Broadman* v. *Commission on Judicial Performance* (1998) 18 Cal.4th 1079, 1092 [77 Cal.Rptr.2d 408, 959 P.2d 715].)

In the matter of Michael Toschi (count twelve), Judge Fletcher refused the prosecutor's request, as part of a plea bargain, to dismiss drunk driving charges against Toschi and instead took steps to subpoena witnesses for trial. I agree that this was misconduct. But the record lacks clear and convincing evidence of the bad faith required for willful misconduct. There is no evidence that Judge Fletcher knew he was acting beyond his judicial powers or that he acted with conscious disregard of whether he was acting beyond his powers. Nor is Judge Fletcher's suspicion that the prosecutor was trying to trick him into an erroneous dismissal that would portray him in a bad light clear and convincing evidence that he was acting for a corrupt purpose other than the faithful discharge of his judicial duties. Rather, he seems to have honestly believed that dismissal was an inappropriate resolution of the drunk driving charges against Toschi. Thus, I disagree with the majority that there is clear and convincing evidence that Judge Fletcher acted with the bad faith required for willful misconduct. Instead, I would find his conduct in this instance to be prejudicial conduct.

## II

As our system of judicial discipline with its range of sanctions recognizes, not every instance of judicial shortcoming deserves the ultimate sanction of removal. We remove judges from office only when necessary for "the protection of the public, the enforcement of rigorous standards of judicial conduct, and the maintenance of public confidence in the integrity and independence of the judicial system." (*Adams* v. *Commission on Judicial Performance* (1995) 10 Cal.4th 866, 912 [42 Cal.Rptr.2d 606, 897 P.2d 544].) That standard is not met here.

It is important to note what is absent in this case. There is no hint that Judge Fletcher is corrupt or venal. There is no suggestion that the judge's decisions have been colored by bias or favoritism. There is no suggestion of the judge's incompetence or dereliction of duty.

What the record reveals instead is a judge who has discharged his duties diligently and in good faith but who sometimes has had difficulty in separating his judicial role from his role in the community. Especially in small communities like Judge Fletcher's town of Bass Lake in Madera County, the lawyers who become judges are often active and prominent figures deeply involved in the life of the community. Becoming a judge requires the lawyer to disengage from those connections and assume a more detached role. Most

of the instances of misconduct by Judge Fletcher have arisen from his failure at times to maintain the detachment inhering in the office of judge, especially by engaging in ex parte contacts with parties and witnesses. On occasion, he has also displayed a quick temper in court.

Although Judge Fletcher's conduct deserves sanction, the judicial system and the public will be adequately protected by public censure; removal is not necessary. As this court said in *Doan* v. *Commission on Judicial Performance* (1995) 11 Cal.4th 294, 339 [45 Cal.Rptr.2d 254, 902 P.2d 272], "we would hesitate to remove a judge who showed himself ready, willing, and able to reform under a less severe sanction." On the record here, Judge Fletcher is such a judge, and he should not be removed from office. He has expressed remorse and resolved to do better. He does not "generally refuse[] to admit he has done anything improper." (*Gonzalez* v. *Commission on Judicial Performance* (1983) 33 Cal.3d 359, 377 [188 Cal.Rptr. 880, 657 P.2d 372].) The most recent of the acts of misconduct in this case occurred in 1994. It does not appear that since then the Commission on Judicial Performance has brought any new formal charges against Judge Fletcher. On the facts of this case, public censure is a more appropriate sanction than, as the majority concludes, removal from office.

A review of our recent judicial discipline cases confirms my view that public censure is the appropriate sanction here. In *Broadman* v. *Commission on Judicial Performance, supra,* 18 Cal.4th 1079, the disciplined judge committed willful misconduct by intentionally misleading a criminal defendant and his counsel in the course of a hearing. Abusing the judicial process, the judge "tricked" an HIV-positive criminal defendant and his defense counsel into agreeing to a continuance of the sentencing hearing so the judge could attempt to craft a sentence that would deny medical treatment to the defendant in prison. The judge also committed prejudicial conduct in two instances: (1) He attempted to influence the outcome of a civil action against an attorney with whom he had a longstanding personal dispute; and (2) he improperly commented to the press about two pending cases in which he was the judge, and continued to do so even after the Commission on Judicial Performance sent him two letters telling him to desist.

In my view, these instances of willful misconduct and prejudicial conduct, and the state of mind in which they were committed, are more egregious and offensive and do more to bring the judiciary into disrepute than does the misconduct that Judge Fletcher has committed. The discipline imposed in *Broadman* v. *Commission on Judicial Performance, supra,* 18 Cal.4th 1079, however, was only public censure; the discipline imposed by the majority here is removal from office.

The most recent cases in which we removed a judge from office involved misconduct far more egregious than Judge Fletcher's. In *Doan* v. *Commission on Judicial Performance, supra,* 11 Cal.4th 294, 339, we removed from

office a judge who had displayed "moral turpitude, dishonesty, and corruption." The judge's willful misconduct included intervening on behalf of a defendant, her gardener, in a pending criminal case while at the same time presiding over his case; corruptly attempting to influence the outcome of a criminal case she was presiding over to ingratiate herself with the defendant's aunt, a friend of the judge's who had lent the judge money; and instructing witnesses not to cooperate with the Commission on Judicial Performance. The judge's prejudicial conduct included failing to disclose, in a criminal case against another nephew of the same friend who had lent the judge money, her relationship with the defendant and failing to disclose that she had discussed the case with her friend; intervening in a criminal case in which the defendant was the friend who had lent her money; failing to report in her financial disclosure forms various loans she had received; borrowing money from a court subordinate and from a police officer who regularly presented warrant applications to her; failing to list in her bankruptcy petition all her creditors; habitual tardiness in commencing court sessions; and offering to provide legal services to a convict whose wife had loaned the judge money. Nothing in this case comes close to that level of misconduct.

In *Adams* v. *Commission on Judicial Performance, supra,* 10 Cal.4th 866, we removed a judge who committed willful misconduct by deliberately providing false information to the Commission on Judicial Performance and who committed prejudicial conduct by accepting gifts and favors from attorneys and a litigant appearing before him and assisting those attorneys in cases pending before the court of which he was a member and before another court. No form of misconduct is more destructive of public confidence in the judiciary than is bribery. And even without a quid pro quo, the image of a judge accepting gifts from lawyers and litigants corrodes the public trust in the judiciary. Accordingly, even though we concluded in *Adams* that the gifts and favors the judge had received had not corruptly influenced his decisions, removal was nonetheless warranted. Again, nothing in this case approaches the level of the misconduct in *Adams.*

For the reasons stated above, I would censure Judge Fletcher rather than remove him from office, the same conclusion reached by the three of the members of the Commission on Judicial Performance.

Mosk, J., concurred.

Petitioner's application for review by the Supreme Court was denied March 17, 1999. Kennard, J., was of the opinion that the petition should be granted.