Filed 11/24/20  Chandler v. Dayton CA1/2

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION TWO

| | |
|---|---|
| RHODA CHANDLER,<br><br>    Plaintiff and Respondent,<br>v.<br><br>EDWARD DAYTON,<br><br>    Defendant and Respondent. | A160485<br><br>(Solano County<br>Super. Ct. No. FCS053619) |

Appellant Edward Dayton, an itinerant who resides in an RV in the city of Fairfield, appeals a three-year civil harassment restraining order entered against him under Code of Civil Procedure section 527.6.[1]  The order protects respondent Rhoda Chandler, a Fairfield resident and local community activist whom he admittedly wanted to "piss off."

We affirm.

**BACKGROUND**

Chandler filed a request for a civil restraining order against Dayton, she secured a temporary restraining order and the matter then proceeded to a noticed hearing at which both parties testified.  The facts stated here are taken from the contested hearing.

---

[1] All further statutory references are to the Code of Civil Procedure.

1

Before the incidents in question, Chandler, acting on behalf of a coalition of downtown residents of Fairfield, had lodged many complaints with local officials about a blighted area of the downtown (known as the "Sem Yeto property") where people were living illegally in RVs. At the end of August 2019, one of her complaints singled out one RV dweller in particular, Edward Dayton. Dayton, she wrote, was "a hoarder," who lives "with his three Pitt bulls [*sic*], which he leaves off leash in the middle of the sidewalk and which he walks around downtown with off leash screaming at. Residents are terrified. Dayton is now hoarding a pile of crap on the city owned parkway between the sidewalk & street and goodness knows where he is dumping their raw sewage."

According to Chandler's testimony, the allegedly harassing conduct began shortly after that—on the evening of September 4, 2019, when Chandler encountered Dayton on the sidewalk while walking her dog. From a distance of about a block away, Chandler saw Dayton yelling at his dogs which were running free, off leash. He appeared to be trying to restrain them. Then she saw two police cars arrive, and so she began videotaping Dayton with his dogs because she was concerned for the police officers' safety.[2]

Chandler's videotape footage was entered into evidence. It depicts Dayton at the opposite end of the block grabbing his two dogs by the collar and leading them back into his RV and then, upon seeing Chandler filming him from some distance away, shouting profanities at her ("Fuck you, cunt! Fuck you, cunt!"). He then walked back to the end of the block to retrieve a large piece of cardboard. Two police officers then stepped onto the sidewalk a

---

[2] Local police were responding to a complaint from someone else about ongoing issues with people living in two RVs.

few yards away from Dayton, positioning themselves between Dayton and Chandler, and Dayton continued shouting profanities while flipping Chandler off with his middle finger as he marched angrily up the sidewalk toward the police and her while clutching the cardboard ("Fucking fat cunt!  Fuck you, cunt!  Fuck you, cunt!").  The police told him to "stop it," and he shouted, "No!  I got every right to free speech!  Fuck you, you cunt!" as he continued marching in their direction.  Seemingly disgusted, he then turned around before reaching the police officers and walked away in the opposite direction toward his RV.  One of the police officers then began walking toward Chandler to speak with her.

Chandler testified that after she stopped videotaping, the police asked her if she had called the police and she told them she hadn't.  She testified Dayton then began screaming at her again ("Yes she did, I know she's the one who called!  Yes, you did!  Fuck you, cunt!").  She was so frightened by Dayton that, after that, she made a point of staying away from that area of her neighborhood.

Chandler testified that about two and a half weeks later, on the morning of September 21, 2019, she arrived home to see Dayton's RV parked in front of her home.  A bit later on, she was standing in her yard with a gardener and Dayton arrived with his dogs, opened the door to his RV, raised his hand and gave her the middle finger.  She became frightened and went inside.  She had no idea how he knew where she lived.

She called the police, and two officers came to her home where they spoke with both parties.  The police interviews are depicted on police bodycam video footage that was entered into evidence.

Dayton was visibly angry.  He insisted to police he had a lawful right to park there for up to 72 hours, called Chandler a "shit-stirrer," said he was

3

"fed up with her," and accused her of harassing *him* for many years, ever since he had lived in a house nearby (from which he said he'd been evicted), and was angry because she'd recently made complaints about him on the Nextdoor app. He told police he knew where she lived because he'd seen her in the neighborhood walking her dogs.

Police acknowledged Dayton had broken no laws but asked him as a courtesy to move his RV in order to de-escalate the situation. He declined, telling them "She has got to learn when to stop. . . . This will probably do no good at all, but it will make a little impact. It will show her what she does to other people." He assured the police he would move after 72 hours to comply with the city's parking ordinance, and after that would repeatedly move his RV every 72 hours again.

Asked if he parked there intentionally to upset Chandler, Dayton replied, "That doesn't matter, I have every right to." He then told police he had parked there just to verify his RV had been moved from its prior location because he'd been cited for a 72-hour violation, but added that he'd been wanting to park in front of her home "to piss her off." Then, he explained, he heard Chandler beeping her car horn at him when she saw him there that morning, and he insisted to police, "I'm not going to tolerate that, so I will use what limited power I have to teach her a lesson. So [I'm] going to stay here . . . between 48 and 72 hours and then [I'm] going to move the vehicle to be compliant [with local law] . . . and we'll see what goes from there." At no time did he tell police that he intended to remain parked there only on that occasion, with no intention ever to return.

Chandler asked the police to request an emergency protective order, and they told her it was unlikely a judge would issue one; they returned later

4

and told her a judge had denied her request for an emergency restraining order.

Chandler testified that later that morning, she saw Dayton bring the rest of his property over from its prior location and store it in front of her house too (a trailer, a car and a scooter). Then he began putting covers on his tires and moving plants there. It seemed like he was planning to stay. This frightened her. He also tied his dogs to a tree, about 20 feet away from her front door and front walkway. The dogs stayed there day and night, sometimes off leash. Chandler was afraid to go outside, lost sleep, cried a lot, and felt like a prisoner in her own home.

She testified that Dayton stayed parked there for three days and then moved his RV after 72 hours, as the police had ordered him to do. She admitted Dayton didn't verbally threaten her while he had been parked there, but testified his very presence frightened her.

Chandler also introduced video footage taken on the third morning (September 24), shortly before Dayton departed, which she argued depicted him "surveilling" her home. The video footage, taken from inside her home, depicts him walking on the sidewalk past her house and then pausing for about ten seconds at the edge of her driveway for no apparent reason, before turning and walking back to his RV. The video does not depict what he was looking at while standing at the perimeter of her property.

For his part, Dayton testified he had no intention of physically attacking Chandler on the day she came upon him with his dogs and began filming him, he just wanted to let her know how he felt about her, because she'd been making harassing and offensive complaints about him. And 17 days later, he only moved his vehicles and belongings in front of her house because he'd been cited the previous day for violating the city's parking

ordinance prohibiting vehicles from parking in a single location for more than 72 hours and so he needed to move his RV. He chose Chandler's home because he knew that Chandler had complained in the past (inaccurately) that his RV was always parked in the same spot without being moved, and he wanted to prove to her he was complying with the local law. He also denied ever peering into her property.

At the conclusion of the hearing, the trial court found that Dayton had "a lot of pent-up anger" toward Chandler as a result of her involvement in local community efforts to rid the downtown area of RVs and that he was offended by a number of things she had said about him. "So there was a lot of anger there, rightly or wrongly."

The court found Dayton parked his RV in front of Chandler's home for retaliatory purposes, and made an adverse credibility finding that he did not do this for the purpose of proving he was complying with the local parking law. "This retaliatory response is synonymous with harassment. It is an admission," likening it to a SLAPP suit. "[H]ere, rather than a lawsuit, [Dayton] is utilizing harassment and scare tactics . . . in order to censor, intimidate, and silence the petitioner in the hope she might abandon her public campaign that has increased enforcement of certain City ordinances, the result of which appears to have made it more difficult for [Dayton] and others to continue to reside in downtown Fairfield with their RVs."

The court entered a restraining order prohibiting Dayton from harassing Chandler and requiring him to stay 100 yards away from her (except only five yards during local public meetings), her home, her car and her place of work. Although Chandler sought a five-year restraining order,

6

the court limited the order to three years.  The court also declined to order Dayton to keep his dogs on leashes at all times.

This timely appeal followed.

## DISCUSSION

Dayton's opening brief is somewhat challenging, because it lacks appropriate factual context, disregards the standard of review and asserts many points unsupported by legal authority and analysis.

" 'In order to demonstrate error, an appellant must supply the reviewing court with some cogent argument supported by legal analysis and citation to the record,' " including by " 'explain[ing] how [the law] applies in his case.' " (*United Grand Corp. v. Malibu Hillbillies, LLC* (2019) 36 Cal.App.5th 142, 162 [treating appellate argument as forfeited].)  We are not required to make arguments for a party or to speculate about arguments a party might intend to raise.  (*Opdyk v. California Horse Racing Bd.* (1995) 34 Cal.App.4th 1826, 1830, fn. 4; *United Grand*, at p. 164.)  " '[O]ne cannot simply say the court erred, and leave it up to the appellate court to figure out why.' " (*People v. JTH Tax, Inc.* (2013) 212 Cal.App.4th 1219, 1237.)

In addition, we consider only the arguments made in an opening brief. " 'We will not ordinarily consider issues raised for the first time in a reply brief.  [Citation.]  An issue is new if it does more than elaborate on issues raised in the opening brief or rebut arguments made by the respondent in respondent's brief.  Fairness militates against allowing an appellant to raise an issue for the first time in a reply brief because consideration of the issue deprives the respondent of the opportunity to counter the appellant by raising opposing arguments about the new issue.' " (*United Grand Corp. v. Malibu Hillbillies, LLC, supra*, 36 Cal.App.5th at p. 158; see also, e.g., *Schmidt v. Superior Court* (2020) 44 Cal.App.5th 570, 592 ["[t]hese reply

7

arguments are forfeited as tardy, because appellants must give the other side fair notice and an opportunity to respond"].)

For these reasons, we will address only those points that are both raised in the opening brief and are supported by adequate legal authority and argument.

## A.    Legal Principles and Standard of Review

Section 527.6 authorizes the issuance of a temporary restraining order and an order after hearing prohibiting "harassment" to protect someone who has suffered "harassment."  (§ 527.6, subd. (a)(1).)

"Harassment" is defined to include not just violence and threats of violence, but also "a knowing and willful course of conduct directed at a specific person that seriously alarms, annoys, or harasses the person, and that serves no legitimate purpose.  The course of conduct must be that which would cause a reasonable person to suffer substantial emotional distress, and must actually cause substantial emotional distress to the petitioner." (§ 527.6, subd. (b)(3).)

A "course of conduct," in turn, is defined as "a pattern of conduct composed of a series of acts over a period of time, however short, evidencing a continuity of purpose, including following or stalking an individual, making harassing telephone calls to an individual, or sending harassing correspondence to an individual by any means, including, but not limited to, the use of public or private mails, interoffice mail, facsimile, or email. Constitutionally protected activity is not included within the meaning of 'course of conduct.' "  (§ 527.6, subd. (b)(1).)

" '[When] assessing whether substantial evidence supports the requisite elements of willful harassment, as defined in . . . section 527.6, we review the evidence before the trial court in accordance with the customary

8

rules of appellate review.  We resolve all factual conflicts and questions of credibility in favor of the prevailing party and indulge in all legitimate and reasonable inferences to uphold the finding of the trial court if it is supported by substantial evidence which is reasonable, credible and of solid value." (*Harris v. Stampolis* (2016) 248 Cal.App.4th 484, 499.)  "[W]hether the facts, when construed most favorably in [petitioner's] favor, are legally sufficient to constitute civil harassment under section 527.6, and whether the restraining order passes constitutional muster, are questions of law subject to de novo review." (*Id.* at p. 497.)

### B.   Analysis

Principally, Dayton argues his conduct did not constitute harassment under section 527.6.  He argues the court's finding he was trying to intimidate and silence Chandler is not supported by the evidence, there was no "course of conduct" involved, and that parking in front of her home had a legitimate purpose.  We disagree.[3]

Actions need not rise to the level of a criminal threat to constitute a course of conduct that is harassing under section 527.6.  (See, e.g., *Brekke v. Wills* (2005) 125 Cal.App.4th 1400, 1413 [affirming injunction].)  Here, Dayton acted abusively toward Chandler *twice* in a manner she found intimidating and threatening.  First, during their September 4 encounter (on the sidewalk, with dogs), he exhibited vile and explosive anger at Chandler, and the trial court could infer it was only because police were present things did not escalate.  Then, some weeks later, he retaliated against her for her complaints to city officials by stationing himself in front of her home with all

---

[3]  Dayton also argues his actions "did not create the supposed fear that [Chandler] has testified to."  That assertion is frivolous, and essentially asks us to reject Chandler's testimony on credibility grounds which we are not permitted to do.

9

of his belongings—lock, stock, barrel *and* dogs—for three days. Chandler experienced his conduct on both occasions as emotionally abusive and intimidating, and an objectively reasonable person would, too.

We reject Dayton's assertion there was no "course of conduct" sufficient to satisfy the statutory definition of harassment. Unlike the authority Dayton cites, this case does not involve a single, brief (five-minute) incident (*Leydon v. Alexander* (1999) 212 Cal.App.3d 1, 3), but a campaign of admittedly deliberate harassment in front of Chandler's home lasting three full days, carried out within weeks of another incident in which he had approached her while cursing at her angrily and aggressively in a manner she, quite reasonably, experienced as threatening. What is more, on the morning Dayton finally departed from Chandler's home, he was captured on video engaging in behavior that the court could infer had no obvious purpose but to annoy, intimidate and/or harass her. Whatever Dayton's actual purpose was when he walked past the front of her home and then deliberately paused to take in the scene at the edge of her driveway, under the circumstances, an objective reasonable person would find it menacing. Dayton cites no authority supporting his contention that his actions, taken together, do not constitute a "course of conduct." Plainly, they do. They comprise "a series of acts over a period of time, however short, evidencing a continuity of purpose" (§ 526, subd. (b)(1))—namely, that of intimidating Chandler and retaliating against her. In Dayton's own words, as he told police, he intended "to piss her off" and send a message that "She has got to learn when to stop . . . ."

We also reject Dayton's argument his actions served a legitimate purpose, that of moving his vehicles. Under all the circumstances the trial court was entitled to infer his motive was hostile and intimidating. Dayton

could have complied with the local parking ordinance by moving his RV anywhere within the entire city of Fairfield, but he admitted to police that he deliberately chose Chandler's home to "make a little impact," "piss her off" and "teach her a lesson" because he was "fed up with her."  And then, when police suggested he relocate because his presence upset Chandler, he refused.  At trial, he admitted he had previously considered parking in front of her home "just to piss her off . . . because I want her to see what it's like for other people to have to deal with that same kind of, to use the term loosely, harassment."  Precisely.  Substantial evidence supports the court's conclusion his actions served no legitimate purpose.

Dayton argues that under *Byers v. Cathcart* (1997) 57 Cal.App.4th 805, "the act of parking serves a legitimate purpose" and could not constitute harassment, but *Byers* does not stand for that proposition and is distinguishable.  It reversed a restraining order preventing the plaintiff from parking her car in a private driveway easement because, unlike here, "[t]here [was] no evidence . . . that the parking was done for the purpose of annoying defendants as opposed to the purpose of storing a vehicle between periods of use." (*Id*. at p. 808.)  "There was no evidence, for example, that plaintiff had available to her other equally convenient parking spaces but nevertheless spitefully chose to park on the driveway easement simply to annoy defendants." (*Id*. at p. 812.)  The parties just legitimately disagreed about the scope of the driveway easement, which was insufficient to justify an anti-harassment restraining order. (*Ibid*.)  Here, by contrast, the very evidence found absent in *Byers* exists.  There is evidence both of ample other available parking options (i.e., the entire city of Fairfield) and Dayton's admittedly spiteful motivation and desire to intimidate.

Dayton also argues cursing at Chandler was constitutionally protected speech. But "[h]ere, defendant's speech was between purely private parties, about purely private parties, on matters of purely private interest. Thus, this case is ' "wholly without the First Amendment concerns with which the Supreme Court of the United States has been struggling." [Citation.]' [citation]; and the trial court properly considered defendant's speech in determining whether to issue injunctive relief pursuant to Code of Civil Procedure section 527.6." (*Brekke v. Wills*, *supra*, 125 Cal.App.4th at p. 1409.) "In California, speech that constitutes 'harassment' within the meaning of section 527.6 is not constitutionally protected, and the victim of the harassment may obtain injunctive relief." (*Huntingdon Life Sciences, Inc. v. Stop Huntingdon Animal Cruelty USA, Inc.* (2005) 129 Cal.App.4th 1228, 1250.) Moreover, it was not just the content of Dayton's speech that was harassing (his cursing, and so forth) but also his actions: he yelled and screamed at her on one occasion, and then camped out in front of her home for three days, refused to leave when asked, and did so for the admitted deliberate purpose of "teaching her a lesson." That is not constitutionally protected activity.

Next, Dayton argues the trial judge improperly based his decision on "his personal feelings" and "possible" bias. The evidence he cites are statements by the trial court that "I was very uncomfortable with the level of [appellant]'s anger," "that caused me great concern, "to yell at someone . . . was very disconcerting," and "there was a lot of anger there, rightly or wrongly." We find nothing improper in these comments. They do not reflect the court's "personal feelings" about the case or "bias," but simply the court's objective evaluation of the evidence as a trier of fact. The authority Dayton cites, *Fletcher v. Commission on Judicial Performance* (1998) 19 Cal.4th 865,

is inapposite.  It involved a judicial disciplinary proceeding (not a civil action), and upheld findings of prejudicial judicial misconduct for extremely derogatory comments by a trial judge that impugned the character of both the prosecutors and other members of the trial court.  (See *id*. at pp. 916-918.)  The trial court here engaged in no conduct even remotely similar.

Dayton argues the injunction is overbroad, because it "in essence prohibit[s] [him] from living and conducting his daily affairs, without somehow coming in range of [Chandler] unknowingly, not intentionally, and then being subject to mandatory arrest," and argues the geographic limitations should be reduced.  The authority he cites, *Nebel v. Sulak* (1999) 73 Cal.App.4th 1363, is inapposite and does not support these contentions.[4]

Finally, Dayton argues the trial court improperly allowed Chandler to file an untimely trial brief, and improperly waived Chandler's obligation to pay her court-ordered, one-half share of court reporter fees.  He has not presented a cogent argument, supported by legal authority and argument, that either procedural ruling was wrong.  Nor has he shown that he was prejudiced by these rulings, and so they would not furnish a basis to reverse the restraining order in any event.  (See *Grappo v. McMills* (2017)

---

[4] *Nebel* held there had not been a proper showing to justify an anti-harassment injunction, and the court abused its discretion when it granted one, because there was no evidence the defendant had engaged in any harassing conduct.  He had merely observed the petitioner quietly from the back of a courtroom while the petitioner conducted judgment debtor's examinations, which are public proceedings.  (*Nebel v. Sulak*, *supra*, 73 Cal.App.4th at p. 1370.)  In dictum, *Nebel* also observed that the injunction, which prevented the defendant from coming within 25 feet of the petitioner, was overbroad because its effect was to prohibit the defendant from attending a public debtor examination which is lawful, constitutionally protected activity.  (*Id*. at pp. 1366, 1370.)

11 Cal.App.5th 996, 1006 [appellant has burden to show not just error but "also 'prejudice arising from' that error"].)

Dayton's remaining arguments in the opening brief are unsupported by legal authority or analysis, improperly attempt to re-argue the weight of the evidence and/or witness credibility, and/or quibble with facts on tangential points. They too are insufficient to demonstrate trial court error, warrant no discussion, and are rejected.

## DISPOSITION

The restraining order is affirmed. Respondent shall recover her costs.

_____

STEWART, J.

We concur.

_____

RICHMAN, Acting P.J.

_____

MILLER, J.

*Chandler v. Dayton* (A160485)

15